**Sarah Clerget**
Chief Legal Counsel
Montana Fish, Wildlife and Parks
1420 East Sixth Avenue
P.O. Box 200701
Helena, MT 59620-0701
(406) 444-4047
sclergetmt.gov
*Attorney for Montana Fish, Wildlife and Parks*
*On behalf of Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA,
MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD-LOLO-BITTERROOT CITIZEN TASK FORCE and WILDEARTH GUARDIANS, | Case No. CV 23-101-M-DWM |
| Plaintiffs, | **DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| STATE OF MONTANA, LESLEY ROBINSON, and GREG GIANFORTE, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................II

TABLE OF AUTHORITIES ..........................................................................III

AFFIDAVIT LIST ....................................................................................... IV

INTRODUCTION .........................................................................................1

BACKGROUND ...........................................................................................3

LEGAL STANDARD....................................................................................10

ARGUMENT ..............................................................................................11

    **A.**   **Plaintiffs are not likely to succeed on the merits. ...........................11**

    **B.**   **Injunctive relief is not necessary to prevent irreparable harm to plaintiff.....................................................................................19**

    **C.**   **The balance of equities and public interest do not support injunctive relief...........................................................................20**

    **D.**   **Plaintiffs have not met the higher standard for the mandatory injunction they seek. ..............................................................22**

CONCLUSION ...........................................................................................25

CERTIFICATE OF COMPLIANCE....................................................................26

CERTIFICATE OF SERVICE ..........................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)..................... 23, 24

*Ctr. for Biological Diversity v. Little*, 622 F. Supp. 3d. 997 (D. Idaho 2022) ........19

*Heckler v. Lopez*, 463 U.S. 1328, 1333, 104 S. Ct. 10, 77 L. Ed. 2d 1431 (1983) 22, 23, 25

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-879 (9th Circ. 2009) ................................................................ 22, 23, 24

*Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996)......................11

*Univ. of Tex.* v. *Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981)...............23

*Winter v. NRDC, Inc.,* 555 U.S. 7, 129 S. Ct. 365 (2008). ......................................11

**Statutes**

§ 87-1-304(8), MCA, ..............................................................................................6

§ 87-1-901(1), MCA ..............................................................................................21

16 U.S.C. §§ 1538(a)(1)(B), (g)............................................................................11

# AFFIDAVIT LIST

Declaration of Ken McDonald

Declaration of Quentin Kujala

Declaration of Nathan Kluge

Declaration of Cecily M. Costello

Declaration of Lee Anderson

## INTRODUCTION

Defendants, State of Montana, Lesley Robinson, and Greg Gianforte (collectively, "the State") submit the following Response to Plaintiff's Motion for Preliminary Injunction. Plaintiffs Flathead-Lolo-Bitterroot Citizen Task Force *et al.*, have moved this court for a Preliminary Injunction to request "this Court to enjoin the State of Montana from authorizing wolf trapping and snaring in occupied grizzly bear habitat in Montana" under the rules adopted by the Commission on August 17, 2023. Plaintiff's Motion should be denied as they fail on all four factors required for an injunction and on the heightened standard required for the mandatory injunction they seek.

Plaintiffs attempt to argue about the future using mistaken facts about the past and a misunderstanding of the present. As to the past, it is not true that 21 bears have been harmed by wolf traps in Montana. Instead, there have been *no* confirmed instances of a bear caught in a public (i.e., non-research) wolf trap for a decade—since 2013. As that was the second year that public wolf trapping was allowed in Montana, it was the first and last time a wolf trap incidentally caught a grizzly bear. As to the present, Plaintiffs claim that the August 17, 2023, wolf regulations passed by the Fish and Wildlife Commission ("Commission"), allow expanded trapping in places with known grizzly bears. This is also simply not true. Plaintiffs never mention, and appear to misunderstand,

the wolf trapping regulations in Montana, which never allow wolf trapping in the estimated occupied range of grizzly bears until the bears are confirmed to be hibernating through contemporaneous field observation. This floating season, instituted in 2021, is still using the 2023 regulations, and again, there have been *no* bears trapped since these regulations were in place.

The Plaintiff's entire premise is that the "takes" of the past will predict the "takes" of the future, given less restrictive regulations. But this premise fails when (1) there have been no relevant takes in the past decade and (2) the regulations are more restrictive now than when that last take occurred, and certainly more restrictive in the last two years when there have been no takes. The Plaintiffs have not and cannot show that it is "reasonably certain" that the 2023 wolf regulations will cause incidental grizzly bear takes.

Further, the remedy they ask for—for this Court to "enjoin the State of Montana from authorizing wolf trapping and snaring in occupied grizzly bear habitat in Montana"(Pls. Br. at 26-27)—is a mandatory injunction that requires a higher standard of proof they cannot meet. Wolf trapping has been allowed in Montana since 2012 and snaring since 2021. Trapping and snaring seasons are the status quo. A request to entirely halt them is not a request to freeze the parties in their current position pending a merits hearing but a request to entirely alter the current—in fact longstanding—practice. At the very most, if this prohibitive

injunction and the Plaintiffs met their burden (which it is not and they have not), an

injunction might return the parties to the previous 2022 Commission regulations.

However, this is unwarranted as the Plaintiff fails on facts and the law.

## BACKGROUND

Nine biologists from Montana Fish, Wildlife and Parks ("MFWP"), the U.S.

Fish and Wildlife Service ("USFWS"), the U.S. Geological Survey Interagency

Grizzly Bear Study Team, and Wyoming Game and Fish have collaboratively

developed a methodology that MFWP uses to create a biennial map of the

"estimated occupied range of grizzly bears in Montana." Costello ¶¶ 9-14;

McDonald ¶¶6-11; Kujala ¶¶ 5-11.



Estimated occupied range of grizzly bears in Montana, 2022.

This map is the key to understanding what is "reasonably certain" regarding grizzly bears in Montana. If you are inside the cross-hatched area that indicates the "estimated occupied range of grizzly bears" (also referred to as "occupied grizzly bear range," "occupied range," "occupied habitat," or "wolf trapping floating start date area,") then it is probable that a grizzly bear has been documented relatively close to your location within the last 15 or 20 years. Costello ¶¶8-9.[1] If you are outside the "estimated occupied range of grizzly bears," then it is more likely that a grizzly bear has not been documented anywhere close to you. However, you may encounter a bear. Costello ¶12.

The methodology behind creating this map is based on all sources of available data on grizzly bear presence, and it has been published, peer-reviewed, and used by multiple agencies and institutions. Costello ¶¶ 7-14. The method was first developed by a group of biologists (including USGS and USFWS) in 2014 for grizzly bears in the GYE, where the authors suggested that the method "provides the most parsimonious balance of inclusion and exclusion of low-density peripheral locations." Costello ¶7. The method involves (a) overlaying an array of 3 km x 3 km grid cells across the ecosystem of interest and the surrounding areas,

---

[1] The colored portions of the map show the "recovery zones" for the Continental Divide Ecosystem (NCDE) and Greater Yellowstone Ecosystem (GYE), Cabinet Yack Ecosystem (CYE), which were set by the USFWS when the grizzly bears were listed. Note that the "estimated occupied range of grizzly bears (crosshatched on the map) is larger than the original "recovery zones." This is because the population and distribution of grizzly bears have expanded so significantly since listing. Costello ¶16.

(b) identifying cells that overlapped verified locations (including known captures, mortalities, human-grizzly bear conflicts, hair samples attributed to grizzly bears through DNA analysis, VHF or GPS fixes of radio-marked bears, and locations of sightings or tracks reported or verified by experienced agency personnel from strong descriptive or photographic evidence) obtained during a specific time frame (i.e., a 15- or 20-year time window ending in the current year); (c) application of a geographic procedure known as zonal analysis to assign new values to each cell as the sum of that cell and its 8 nearest neighbors (i.e., range = 0 to 9); and (d) application of another geographic procedure known as ordinary kriging to obtain a smooth boundary within which summed values are generally ≥1. Costello ¶9. This is obviously a highly technical process using multiple forms of data requiring substantial expertise. MFWP does not guess where the grizzly bears are. We calculate it with precision.

The map of the "estimated occupied range of grizzly bears" above is the same map that the US Fish and Wildlife Service ("USFWS") uses to show the "occupied range" of grizzly bears in Montana (only the labels and colors are different from the data is the same). Costello ¶11. The USFWS is one of the collaborating partners that create the map (both the methodology and actual data input). *Id.*¶¶7-9. Therefore, the "estimated occupied range of grizzly bears" shown on this map is where the USFWS and Montana Fish, Wildlife, and Parks (MFWP)

agree that threatened grizzly bears will likely be found. *Id*; *see also* McDonald ¶¶5-7.

The Fish and Wildlife Commission ("Commission") used the 2022 "estimated occupied range of grizzly bears" map to set the 2023 wolf trapping season and regulations for wolf trapping seasons. McDonald ¶¶8-10; Kujala ¶¶5, 9-10. The Commission, in their 2021 wolf trapping regulations and then in subsequent seasons since 2021, adopted a "floating start date" for wolf trapping inside areas based upon the "estimated occupied range of grizzly bears." McDonald ¶¶8-10; Kujala ¶¶5, 9-10. The express intent of this floating start date is to prevent incidental captures of grizzly bears in a wolf trap. McDonald ¶¶8-10; Kujala ¶¶7,10.

The default opening date for wolf trapping is the Monday after Thanksgiving based on § 87-1-304(8), MCA,  which says, "The commission may authorize a wolf trapping season that opens the first Monday after Thanksgiving and closes March 15 of the following calendar year, *except that the commission may adjust the dates* for specific wolf management units based on regional recommendations." (emphasis added). McDonald ¶9. Based on the delegated discretion in the statute, the Commission has set a later default wolf trapping start date of December 31 in the "estimated occupied grizzly bear range." *Id.*; Kujala ¶7. However, this default start date *only applies if there is information to indicate grizzly bear activity has*

*ceased*, indicating bears are in dens hibernating and are not present for potential incidental capture. McDonald ¶9; Kujala ¶7.

Starting in early December and then every week after that in December or until all areas are open, MFWP assesses grizzly bear activity in each different trapping district (a.k.a. Wolf Management Unit or "WMU") or even a portion of a trapping district to determine if whether grizzly bears have gone into hibernation. McDonald ¶9. The assessment includes inputs from MFWP bear specialists who use radio collar telemetry information to determine whether collared bears are denning, sightings of bears or tracks, conflicts, reports of observations, and black bear activity (as a surrogate for grizzly bear activity since if black bears are still active, grizzly bears are also likely still active,) takes into account current and predicted weather, and utilizes the professional judgment of each highly trained local bear specialist in their assigned area of responsibility. McDonald ¶10.

Using the above information, bear specialists make a recommendation regarding whether an area could be opened to trapping. *Id.* That recommendation is reviewed by regional wildlife managers and if accepted, is passed on to and reviewed by agency leadership, who make the final decision on the specialist's recommendation. *Id.* To date, agency leadership has approved these recommendations.  Based on that assessment, portions of the estimated occupied range may open to wolf trapping earlier than December 31. *Id.* For example, per

the map below, the 2022 season opening in the "estimated occupied range of grizzly bears" occurred at different times in different areas between December 12 and December 24, 2022. *Id.*



*No* known grizzly bears have been caught in a *public, legally set wolf trap of any kind* (including snare or foot traps) *since 2013*, and *none since implementing the floating start date* in the "estimated occupied range of grizzly bears" in 2021. McDonald ¶ 11, Ex A; Kujala ¶6.

MFWP has records of 21 grizzly bears being caught in a trap set for a species other than a bear (any species, not just wolves) since 1988. McDonald ¶ 11,

Ex A; Kujala ¶6. One on that list was an unverified report from the public, and another was "assumed" but never confirmed. *Id.* That means only 19 confirmed incidental captures have occurred since 1988. *Id*. Of the 19 confirmed incidents, only three were reported caught in the December-March timeframe during which public wolf trapping is currently allowed, and not all of those were by wolf traps. [2] *Id.* Seven were caught by *MFWP, Tribal, and National Park Service agency staff engaged in wolf monitoring and research*, which occurs in the spring/summer (outside of the wolf trapping season). *Id.* Four reports were captured by *Wildlife Services staff* – professional trappers responding to livestock depredations. *Id*. Only *one* of the 21 on the list was ever confirmed to have been trapped by a public wolf trapper, and in the summer of 2013 (which is now outside of the wolf trapping season). *Id*.

*No* grizzly bears have been incidentally captured in a public trapper's wolf trap since the Commission implemented the floating start date tied to the "estimated occupied range of grizzly bears" in 2021. McDonald ¶ 11, Ex A; Kujala ¶6. Additionally, *all 21* occurred *within* what is now designated as the "estimated

---

[2] There are only two public trapping incidental captures that have occurred since 2013, both of which were by coyote traps, *not wolf traps* (something an injunction on the wolf trapping season would not affect). The Plaintiffs made much of an incident on December 18th of 2018. Manly ¶9. December 18th is now outside the default and the floating start date. *Id* Additionally, Lee Anderson personally responded to the 2013 incident (the only one in his 24 years of experience in Region 1, which contains most of the grizzly bears in the state), and he testified in his affidavit that the wolf was released unharmed. Anderson ¶6. The other public coyote trap incidental capture occurred on September 3rd of 2021, which is again far outside of the wolf trapping season imposed by the current or prior regulatory structure.

occupied range of grizzly bears in Montana," meaning that, even if all 21 were caught in wolf traps (which they were not), they would all be prevented by the floating start date in effect now. McDonald ¶ 11, Ex A; Kujala ¶6.

In general, grizzly bear populations in Montana are so healthy that the USFWS is currently considering petitions to delist grizzly bears in both the NCDE and GYE. Grizzly bears were listed as Threatened under the Endangered Species Act in 1975. At that time, there were an estimated 700-800 bears, the majority of which were in Montana and in Yellowstone National Park in what is now the Northern Continental Divide Ecosystem (NCDE) and Greater Yellowstone Ecosystem (GYE), occurring in approximately 19,000 square miles. McDonald ¶5. Population numbers and distribution have increased to the point where presently grizzly bears regularly occupy an area of more than 43,000 square miles. *Id.* The estimated grizzly bear population in the GYE, NCDE, and Cabinet Yack Ecosystem (CYE) is currently greater than 2,000 bears. *Id.* The increase in distribution and range can be attributed to protections for the bears and their habitat, along with ongoing outreach about bear awareness to reduce conflicts and timely and professional responses to conflicts when they do occur. *Id.*

## **LEGAL STANDARD**

Plaintiffs that seek a Preliminary Injunction must establish that they are likely to succeed on the merits, are likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. NRDC, Inc.,* 555 U.S. 7, 129 S. Ct. 365 (2008). A Preliminary Injunction is "an extraordinary remedy never awarded as of right." *Id.* at p. 377. Courts must consider the effect on each party of the granting or withholding of the requested relief. *Id.* at p. 376.

The ESA prohibits states from authorizing activities that are reasonably likely to take members of a listed species. *See* 16 U.S.C. §§ 1538(a)(1)(B), (g) (prohibiting unpermitted take); "A reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction" in the context of ESA Section 9. *Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996).

## ARGUMENT

### A.    Plaintiffs are not likely to succeed on the merits.

In the above "Background" section and the attached affidavits of MFWP's Research Wildlife Biologist Dr. Cecily Costello, Chief of Conservation Policy Quentin Kujala, Wildlife Division Administrator Ken McDonald, Statewide Furbearer Coordinator Nathan Kluge, and Region 1 Supervisor Lee Anderson, the State explains the lengths to which the Commission and MFWP have gone to ensure that, during the wolf trapping season, there will be no incidental takes of grizzly bears. By creating a scientifically sound map of the "estimated occupied

range of grizzly bears," with a floating season start date tied to it, the Commission has created a regulatory scheme that prevents wolf trapping and snaring while bears are out of their dens. And it is working. Even if we consider the last incidental capture by a wolf trap—which occurred five years ago, in 2013—that incident occurred on December 18th, at a time when the season started on December 15th. The regulations are now more restrictive, with a default wolf trapping start date of December 31st, unless (via the floating start date instituted in 2021) biologists determine, based on data, field observations, and professional judgment, that bears are no longer active. McDonald ¶9. Since the floating start date began in 2021, *no grizzly bears have been caught in a wolf trap of any kind*. If the event has not taken place in the last two years under the same regulatory structure, then it is not "reasonably certain" to occur this year.

The map that Plaintiffs provide on page 6 of their brief is a different USFWS map, used for a different purpose, known as the "may be present" map. Costello ¶¶11-12 Outside of the "estimated occupied range of grizzly bears," the "may be present" map, as its name implies, shows "watersheds" (a.k.a. outliers) where there is potential grizzly bear presence. *Id*. Below is the same map the Plaintiffs provided, but with the addition of the verified outlier locations (only those within Montana are shown) on which the "watersheds" were identified outside of the "estimated occupied range of grizzly bears." *Id*.

**RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 12**



As Dr. Costello explains, one brown dot indicates one verified observation that a grizzly bear was once present—e.g., one footprint, one game camera photograph, or one verified report from a member of the public—sometime *in the last ten years*. Costello ¶¶11-12. Per the methodology used by MFWP and USFWS, these spatially and temporally infrequent data points are not enough to indicate the continued presence of bears in the area. *Id.* In other words, if there were enough data to indicate that bears occupied the area where a brown dot appears (or that is marked in blue on the "may be present" map), then the

"estimated occupied range of grizzly bears in Montana," would expand to include that area within its polygon border. *Id.* In reality, these brown dots only show where a bear was observed once, but it is unknown if the bear may have simply passed through the area sometime in the last ten years. *Id.* As discussed above, *none* of the 21 incidental captures the Plaintiffs highlight occurred in a "may be present" area outside the "estimated occupied range of grizzly bears in Montana." McDonald ¶ 11, Ex A; Kujala ¶6. Rather, all 21 occurred within the "estimated occupied range of grizzly bears in Montana." McDonald ¶ 11, Ex A; Kujala ¶6. This confirms how accurate the map of "estimated occupied range of grizzly bears in Montana" is. Since there have *never been any* incidental takes of grizzly bears outside of the mapped area as a result of wolf trapping, it is *not* "reasonably certain" that a bear would be incidentally taken by a wolf trap or snare even in the "may be present" area "outside of the estimated occupied range of grizzly bears."

Even if a random bear, in a "may be present" area outside the "estimated occupied range of grizzly bears," who never went into hibernation, were to come across a wolf snare, the bear would be able to break it without harm because of the required breakaway device. Kluge ¶14. A breakaway device is a crimped piece of metal along the snare cable that makes the snare fall apart if pressure exceeds the device's rating. *Id.* Breakaway devices are made at different ratings (e.g., 250 pounds, 350 pounds, 1000 pounds), so the snare will break if an animal too large is

unintentionally captured. *Id.* Much research has gone into bear biologists building foot snares to capture grizzly bears for research purposes. *Id.* Adult grizzly bears (averaging 250 kg) consistently exceeded 16.8 kilonewtons (kN) of force, which is equivalent to 3,776 pounds of force. *Id.* Wolf snares set can only be equipped with a breakaway device with a maximum of 1,000 pounds, with most trappers using breakaways closer to 750 pounds. *Id.* Regardless, both breakaways stand to be broken free by the average-weight grizzly bear in Montana. *Id* As soon as a bear or large animal gets captured by one of these snares, the first hard pull would break the snare and allow the animal to run away unharmed and the cable to remain at the trap site. *Id.*

Another layer of protection the Plaintiffs fail to consider is that provided by "Lynx Protection Zones" (LPZs). Wolf snaring is *not* permitted *at all* on public lands in the LPZs. Kluge ¶14. A total of 74% of LPZs are public land. *Id.* ¶6. As the map below shows, LPZs extend beyond the boundaries even of the "estimated occupied range of grizzly bears," providing even more area of protection for grizzly bears. *Id.*



This map of wolf regional boundaries and lynx protection zones appears on page 14 of the 2023 Montana wolf, furbearer, trapping regulations. "Floating Trapping Start Date Area" referenced on the key in the map above is the same area as the "estimated occupied range of grizzly bears" (just using another name). Kujala ¶9. Within the LPZs, *any* snare (other than a wolf snare, which is not allowed at all) used on public land must have a breakaway device of no more than 350 pounds. Kluge ¶14. A standard adult grizzly bear could easily break away from *any* snare set in an LPZ without harm and without retaining any part of the snare. *Id.*

Plaintiffs claim that traps—particularly snares and footholds—kill and maim animals indiscriminately. This is simply untrue. Kluge ¶¶12, 18.  MFWP does not

have any evidence that a trap has killed a grizzly bear in Montana. *Id*. ¶18; Kujala

¶10. MFWP also has no evidence of capture myopathy (a previously captured

animal dying after being released due to the stress and lactic acid built us from the

capture event) in grizzly bears that have been involved with non-target captures by

recreational trappers. Kluge ¶¶12, 18. Trapping is managed through scientifically

based regulations that trained conservation enforcement officers strictly enforce. *Id*

¶6-12. MFWP continually reviews and develops rules, regulations, education

programs, and capture methods that consider animal welfare. *Id.* Some examples of

these include particular regulations and training regarding trap placement (Kluge ¶

6), trap size (Kluge ¶7), pan tension (Kluge ¶8), and timing (Kluge ¶9). MFWP

bases its regulations on, and provides recommendations for, the specific traps for

each Montana species. Kluge ¶7. These were developed by the Association of Fish

and Wildlife Agencies ("AFWA"), which has spent over $4 million researching the

practicality, efficiency, selectivity, safety, and welfare of each type of trap for each

species we can trap in Montana and throughout North America. *Id.*

Plaintiffs claim that the 2023 wolf regulations have gotten less restrictive

because they "authorize: (1) wolf trapping and snaring in occupied grizzly bear

habitat when the bears are likely to be out of their dens; (2) allows up to 20 wolves

per person, 10 by hunting and 10 by trapping, increased from 5 in 2020; and (3)

allows baiting in occupied grizzly bear habitat." Pls. Br. at 18. Point (1) is

obviously untrue, once one understands the regulation structure, including the "estimated occupied range of grizzly bears" map and the floating season.

Point (2) is a correct statement of the increased "bag limit" per person in the 2023 regulations, but that limit has no bearing on the possibility of future take. For the 2022 season, one trapper caught 10 wolves. Kujala ¶8. 73% of successful wolf trappers caught 2 or fewer wolves. *Id*. And, given the regulatory structure, it does not matter how many wolves individual can trap if they cannot trap anywhere the bears are or while they are active. The Plaintiffs have provided *no evidence* anywhere in their brief or affidavits that any bag limits are linked to take of grizzly bears, either in the past or the future.

Point (3), again, is untrue once one understands the structure of the wolf regulations and that no trapping is allowed in occupied grizzly bear habitat. Additionally, the regulations regarding baiting for wolf trapping did not change in 2023, indeed they have been consistent since wolf trapping was first allowed in 2012. None of these three points actually support the Plaintiffs claim.

Montana's wolf trapping regulations are specifically tailored to avoid incidental captures of grizzly bears, their timing in winter when bears are hibernating, and the added protection of a floating start date within the "estimated occupied range of grizzly bears." Kujala ¶7. And, as stated above, they are working. If no grizzly bear has been incidentally captured by a wolf trap in the last

two years, and the basic regulation structure has not changed for the 2023 regulations, then the Plaintiffs cannot show on the merits that it is "reasonably certain" that Montana's trapping regulations will cause incidental captures of grizzly bears in wolf traps.

**B.      Injunctive relief is not necessary to prevent irreparable harm to plaintiff.**

As shown above, the harm the Plaintiffs anticipate has not been documented since 2013 and has never occurred under the current regulation structure that prohibits wolf trapping within  the "estimated occupied range of grizzly bears" outside of the "floating start date." Kujala ¶6.

The declarations provided by Plaintiff in support of their motion are speculative and vague. Regarding past incidental captures, they speculate about whether: 1) the trap was set for a wolf, 2) the trap caused the injury; 3) whether the trap was a legal trap (i.e., properly set, properly tagged with identification, properly checked within time frames, had a breakaway device, and whether they followed setbacks). *See Ctr. for Biological Diversity v. Little*, 622 F. Supp. 3d. 997 (D. Idaho 2022, at ¶ 1000. To propose that an injury resulted because a bear "could have" been caught in a trap is insufficient to grant a preliminary injunction. (*See* Declaration of Tim Manley, Doc. 6-6 at 6, 12). Tim Manley stated throughout his

Declaration that he did not know with certainty what caused injuries he observed to bears. *Id.*

Additionally, much of the evidence presented by Plaintiffs is not applicable to trapping activities in Montana. Many of the bears presented by Plaintiffs occurred outside of Montana. Montana has no evidence of a grizzly bear getting caught in a snare or a body-gripping trap. Kluge ¶16. The research Plaintiffs' and their declarants cite is equally inapplicable to Montana. Lamb et al. (2022) is the most cited publication by Plaintiffs, cited seven times in Plaintiffs First Amended Complaint. Kluge ¶17. The State of Montana was separate from that study, and the trapping regulations in the study areas of that research (British Columbia, Canada) are less restrictive than the regulations MFWP requires when trapping in Montana (British Columbia 2022, MFWP 2023). *Id.* The relief requested here relates only to *Montana's* wolf trapping regulations and the likelihood of incidental capture *in Montana*. Evidence of things occurring outside Montana is, therefore, irrelevant. Speculative and irrelevant evidence does not provide adequate proof that enjoining the wolf trapping season in Montana will prevent the incidental take of grizzly bears.

**C.    The balance of equities and public interest do not support injunctive relief.**

The Montana legislature has made it very clear that the Montana public wants wolf trapping, specifically including the use of snares, to lower the wolf population in Montana. During the 2021 session, the legislature passed statutes that 1) authorized a wolf trapping season (House Bill 225), 2) specifically provided for use of snares during trapping season (House Bill 224), 3) directed the Commission to reduce wolf populations "to a sustainable level" and identify regulatory tools the Commission could utilize in said effort (Senate Bill 314), and 4) provided for hunting and trapping reimbursement (Senate Bill 267).  In § 87-1-901(1), MCA, the legislature specifically ordered that "the commission shall establish by rule hunting and trapping seasons for wolves with the intent to reduce the wolf population in this state to a sustainable level, but not less than the number of wolves necessary to support at least 15 breeding pairs." The Montana public has therefore spoken, through its legislature, that it is in the public interest to reduce the wolf population through trapping regulations, including the use of snares. Halting the wolf trapping season through this injunction would directly contradict this stated public interest.

Further, the USFWS is currently considering the delisting of grizzly bears in both the NCDE and the GYE. Kujala ¶4. This indicates that, perhaps even before the merits of this case are heard, grizzly bears may be delisted and render this case moot. Even if the USFWS does not reach a decision soon, the evidence shows that

grizzly bears in Montana are thriving, with over 2,000 bears currently in residence. McDonald ¶5. And again, no bear has been incidentally captured by a recreational wolf trap in Montana in a decade. Given the abundance of bears, their potential delisting, and the little or no likelihood of harm, the balance of equities and public interest does not support injunctive relief.

### D.   Plaintiffs have not met the higher standard for the mandatory injunction they seek.

A preliminary injunction can take two forms. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-879 (9th Circ. 2009) A prohibitory injunction prohibits a party from taking action and "pre-serve[s] the status quo pending a determination of the action on the merits." *Id.* (quoting *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988) (*see also Heckler v. Lopez*, 463 U.S. 1328, 1333, 104 S. Ct. 10, 77 L. Ed. 2d 1431 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits")).

A mandatory injunction "orders a responsible party to 'take action.'" *Id.* (quoting *Meghrig v. KFC Western*., 516 U.S. 479, 484, 116 S. Ct. 1251, 134 L. Ed. 2d 121 (1996)). "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo Pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Anderson v.*

*United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)). In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id*. (quoting *Clune v. Publishers' Ass'n of N.Y. City*, 214 F. Supp. 520, 531 (S.D.N.Y. 1963)). The injunction the Plaintiffs request here is "unlike the usual 'prohibitory' injunction which merely freezes the positions of the parties until the court can hear the case on the merits." See *Univ. of Tex.* v. *Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981). Here, as in these cited cases, the injunction sought "is in substance, if not in terms, a mandatory one, which 'like a mandamus, is an extraordinary remedial process….'" *Heckler v. Lopez*, 463 U.S. 1328, 1333-1334 (quoting *Morrison* v. *Work*, 266 U.S. 481, 490 (1925)).

The relief the Plaintiffs request is for this Court to "enjoin the State of Montana from authorizing wolf trapping and snaring in occupied grizzly bear habitat in Montana." Pls. Br. at 26-27. This is a request for the State and the Court to "take action" and drastically change a longstanding practice in Montana. *Marlyn Nutraceuticals,* 571 F.3d at 878-879. In *Maralyn Nutraceuticals*, the Plaintiff was asking the Court to force a company to recall a product that was already out on the market. The Court stated:

> The *status quo ante litem* referenced in *Chalk* means "the last,
> uncontested status which preceded the pending controversy." *Regents of
> the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)
> (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th
> Cir. 1963)). In this case, Marlyn had distributed its own version of
> Wobenzym prior to the lawsuit. The district court ordered that Marlyn
> recall its product…. That remedy went beyond the status quo pending
> litigation and instead required Marlyn to take the affirmative step of
> recalling its product.

*Id.* at 879. Here, the Plaintiffs are asking the State and the Court to recall the

opportunity to hunt and snare wolves, which has occurred—alongside the

ESA listing for grizzly bears—for 11 years. This undermines the immediacy

of the harm the Plaintiffs claim. It certainly is not the "extreme or very serious

damage" that will immediately result if their injunction is not granted.

*Anderson, 612 F.2d at 1114.* Had the Plaintiffs wished to stop all wolf

trapping, they could have brought a mandamus action (or a prohibitive

injunctive action) when wolf trapping with foothold traps was first authorized

in 2012 or when snares were added in 2021. They did not bring either of those

suits. The Plaintiffs have not met the four factors for an injunction, let alone

shown that "the facts and law clearly favor" them, but rather a "doubtful

case[]" at best.

The Plaintiffs state that the harm they suffer and the state action they

wish to enjoin is "under regulations approved by the State of Montana Fish

and Wildlife Commission on August 17, 2023." The Pls. Br. at 4. The status

quo and position of the parties before these August 17, 2023 regulations were adopted by the Commission was a wolf trapping and snaring season governed by the Commission regulations adopted on August 25, 2022. The status quo was *not* a complete cessation of all wolf trapping in Montana—the 2023 Commission regulations did not create a trapping and snaring season. At best, were the Plaintiffs asking for a prohibitory injunction to "freeze[] the positions of the parties," they would seek a return to the 2022 regulations. *Heckler*, 463 U.S. at 1333. Therefore, this preliminary injunction is entirely unnecessary, but at the very most, the appropriate remedy is a return to the status quo regulations in place before the Plaintiffs moved for this injunction.

## CONCLUSION

Because the Plaintiffs have failed to meet any of the factors required for a preliminary injunction and failed to meet the requirements for a mandatory injunction, this Court should deny Plaintiff's Motion in its entirety. In the alternative, if the Court grants the injunction, the only relief afforded should be to return to the regulations in place before August 17, 2023.

RESPECTFULLY SUBMITTED this 23rd day of October, 2023.

By: */s/ Sarah Clerget*
**Sarah Clerget**
Chief Legal Counsel
Montana Fish, Wildlife and Parks

**RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 25**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 5399 words, excluding the caption, certificates of service and compliance, and if required, any tables of contents and authorities, and exhibit index.

By: */s/ Sarah Clerget*

    **Sarah Clerget**
    Chief Legal Counsel
    Montana Fish, Wildlife and Parks

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of October 2023, I electronically filed the foregoing document with the clerk of the court for the United States District Court for the District of Montana, using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


By: */s/  Christina Bell* 
    Paralegal