IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD-LOLO-BITTERROOT CITIZEN TASK FORCE and WILDEARTH GUARDIANS, | CV 23–101–M–DWM |
| Plaintiffs, | ORDER |
| vs. | |
| STATE OF MONTANA, LESLEY ROBINSON, and GREG GIANFORTE, | |
| Defendants. | |

This case challenges regulations approved by the Montana Fish and
Wildlife Commission ("Commission") on August 17, 2023, which authorize wolf
trapping and snaring within occupied grizzly bear habitat in Montana.  Plaintiffs
are environmental organizations that argue the regulations are reasonably certain to
cause trapping and snaring of grizzly bears in violation of § 9 of the Endangered
Species Act ("ESA").  16 U.S.C. § 1538(a)(1)(B).  Defendants are the State of
Montana ("State"), Commission Chair Lesley Robinson, and Governor Greg
Gianforte (collectively, "Defendants").  (*See* Doc. 4.)  Because the State's
regulations allow wolf trapping to begin as early as the Monday after
Thanksgiving, (Doc. 4 at ¶ 52), Plaintiffs seek a preliminary injunction to enjoin
the State's wolf trapping and snaring season as authorized by the new rules, (Doc.

1

5).  A hearing was held on November 20, 2023.  (Doc. 32.)  On the record before the Court, Plaintiffs have established serious questions on the merits and a reasonably certain threat of imminent harm to grizzly bears should Montana's wolf trapping and snaring seasons proceed as planned, Plaintiffs' motion is granted to the extent explained below.

## BACKGROUND

The United States Fish and Wildlife Service ("Service") listed the grizzly bear as a "threatened" species under the ESA in 1975 after the continental population had precipitously declined in the century since European settlers began moving west.  *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1004–05 (D. Mont. 2018) (citations omitted).  "Congress passed the ESA in part because it wanted to force the agencies' hand, particularly in regard to the grizzly bear." *Id.* at 1005.  By 2000, grizzly bears in the lower-48 states occupied a mere two percent of their historic range across six distinct ecosystems in Montana (Northern Continental Divide, Greater Yellowstone, Cabinet-Yaak), Idaho (Greater Yellowstone, Cabinet-Yaak, and Selkirk), Wyoming (Greater Yellowstone), and Washington (Selkirk and North Cascades).  *All. for the Wild Rockies v. Cooley*, 2023 WL 2522945, at *1 (D. Mont. Mar. 14, 2023).  In recent years, grizzly bear populations have been growing and their home range expanding beyond the boundaries of established recovery zones.  (Doc. 19-4 at ¶ 16.)  For example, "as

2

recently as October 2022, grizzly bears have been seen in the Bitterroot

Ecosystem," though a November 2000 study indicated there were no grizzly bears

in the Bitterroot Ecosystem. *Cooley*, 2023 WL 2522945, at *2.

Montana has allowed wolf trapping since 2012. *See Montana Commission*

*Approved Wolf Trapping*, Flathead Beacon (July 12, 2012), https://perma.cc/

QNG3-KFXY.  Trapping license sales peaked in 2012 with 6,185 licenses sold.

(Doc. 19-3 at ¶ 11.)  In 2021, the Montana Legislature passed several bills, which

Governor Gianforte signed into law, permitting the extension of the wolf trapping

season and requiring the Commission to authorize snaring for wolves. *See* Mont.

Code. Ann. § 87-1-304(8) (2021); *see also* H.B. 225 (amending Mont. Code Ann.

§ 87-1-304), H.B. 224 (amending Mont. Code Ann. § 87-1-901), and S.B. 314

(same), 67th Leg., Reg. Sess. (Mont. 2021).  The new laws also permitted the

Commission to authorize both night hunting and bait hunting and trapping for

wolves, and permitted the Commission to authorize "the harvest of an unlimited

number of wolves" by an individual hunter until the quota is reached. *See* Mont.

Code Ann. § 87-1-901(2).

In 2020, the wolf trapping season opened December 15 and closed February

28, statewide.  Montana Fish, Wildlife and Parks, 2020 Wolf Hunting and

Trapping Regulations, https://perma.cc/97HR-S5AG.  As a result of these new

laws, in 2021, the Commission extended the length of the wolf trapping and

snaring season by 31 days to the first Monday after Thanksgiving through March
15, statewide.  Montana Fish, Wildlife and Parks, 2021 Wolf Hunting and
Trapping Regulations, https://perma.cc/FA9N-CF34.

After significant public opposition to the new 2021 regulations, the
Commission nonetheless implemented a floating wolf trapping and snaring season
opening date inside the "estimated occupied range of grizzly bears[1]," permitting
trapping for wolves to begin as early as the Monday after Thanksgiving in
occupied areas, but only based on "a real time reading of conditions," which the
Defendants describe as evidence that the majority of bears in these areas have
begun hibernation.[2]  (*See* Docs. 6-10 at 18; 20 at ¶ 9.)  Defendants argue the intent
of this floating start date is to prevent the unintentional captures of grizzly bears in
wolf traps.  (Docs. 20 at ¶¶ 8–10; 19-2 at ¶¶ 7, 10.)  Starting in early December and
then every week after that, biologists working in different parts of the State assess

---

[1] This map is the same map that the U.S. Fish and Wildlife Service uses to show
the "occupied range" of grizzly bears in Montana, and represents "an estimate of
the roughly contiguous, minimum area within which grizzly bears have established
residency or have demonstrated habitat use."  (Doc. 19-4 at ¶¶ 8, 11.)  Plaintiffs
argue it is more appropriate to use the Service's "may be present map," which
more accurately represents the growth of grizzly bear populations in Montana.
[2] Plaintiffs note that, for example, only about 7% of grizzlies in the Northern
Continental Divide Ecosystem are collared, and those collared bears den primarily
at higher elevations where denning typically happens earliest.  (Docs. 21 at ¶¶ 2–3;
22 at ¶ 5; 24 at ¶ 10; 28 at ¶ 1.)  Plaintiffs argue the State's limited sample size and
geographic scope of telemetry data creates significant flaws in Montana's analysis.

radio collar telemetry data and other anecdotal observations to determine whether the grizzly bears in the area have gone into hibernation.  (Doc. 20 at ¶ 9.)

On August 17, 2023, the Commission adopted its 2023 Wolf and Furbearer Trapping and Hunting Regulations, (Doc. 6-10), which again authorized a wolf trapping and snaring season from the Monday after Thanksgiving through March 15, 2024, with the floating start date in effect, (*see* Doc. 6-10 at 18).  For the 2021 and 2022 wolf seasons, the Commission had extended the geographic area affected by the floating start beyond the boundaries of the mapped "estimated occupied range of grizzly bears," (Doc. 19-2 at ¶ 9), but the affected areas for the 2023 season follow the map's exact boundaries.  (Doc. 19-2 at ¶ 10.)  It is unclear precisely how much grizzly bear range is implicated by this change, but Plaintiffs argue the areas are significant for ecosystem connectivity.  (Doc. 24 at ¶ 13; *see* Doc. 20 at ¶ 8 (showing a map of the areas subject to the floating start date in 2022 versus 2023).)

Montana's trapping regulations permit wolf trappers to use foothold traps with an inside jaw spread of up to nine inches, which is large enough to capture a grizzly bear.  (Docs. 19-3 at ¶ 7; 6-3 at ¶ 11.)  Due to their size and strength, these traps can cause toe fractures and toe amputations when grizzly bears fight to free themselves.  (Doc. 6-3 at ¶ 11.)  Other injuries to bears from traps and snares include spiral fractures to front limb bones, sprains, dislocations, strain myopathy,

tooth and gum damage from biting the traps and snares, hypothermia, hyperthermia, and dehydration. (Docs. 6-1 at ¶ 28; 6-3 at ¶ 46; 6-5 at ¶ 7.) Each of these untoward events would violate § 9 of the ESA. Plaintiffs note that grizzly bears are among the most dexterous of all large carnivores, and they constantly use their flexuous front limbs and paws to forage for food and dig their dens, meaning that any loss of function in a grizzly bear's paws or limbs can lead to severe consequences. (Docs. 6-1 at ¶¶ 27–28; 6-5 at ¶ 7.)

Coyotes are "predatory animals" under Montana law, Mont. Code Ann. § 87-6-101(25), which allows residents to trap and snare predatory animals without a license, year-round, including in occupied grizzly bear habitat, Mont. Code Ann. § 87-6-301(d). Although coyote traps are smaller than wolf traps, grizzly bears have been captured by both. (Docs. 20 at 14–16; 19-3 at ¶¶ 11, 13–15.) Montana Fish, Wildlife and Parks has recorded more than 20 instances of grizzly bears being caught in a trap set for other species since 1988, (Docs. 6-3 at ¶ 13; 19-3 at ¶ 11; 25 at ¶ 13), and Plaintiffs' witness affidavits establish numerous other examples of incidences in Montana and across the region where grizzly bears were accidentally captured and injured by baited traps set for other animals, including wolves and coyotes, (see, e.g., Doc. 6-1 at ¶¶ 26–29).

As Defendants point out, the Service has explored potentially delisting the grizzly bear in the Northern Continental Divide and Greater Yellowstone

6

ecosystems in recent years; however, that conversation now seems to be on hold.

In February 2023, the Service's director Martha Williams, wrote to Montana Fish,

Wildlife and Parks Director Hank Worsech indicating that several bills proposed

by the Montana Legislature conflicted with the ESA and were "inconsistent with

commitments made by the State of Montana on how grizzly bears would be

managed if they were to be delisted." (Doc. 27-1 at 1.)  Specifically, Director

Williams wrote that the agency was concerned "other recently passed legislation

allowing wolf snaring and trapping and allowing the use of dogs to pursue black

bears in occupied grizzly bear range will invite conflicts between hunters and

grizzly bears, including potential injuries and mortalities for grizzly bears and risks

to human safety." (Doc. 27-1 at 2.)

On September 11, 2023, Plaintiffs filed the present action.  (Doc. 1.)

Plaintiffs filed an amended complaint on September 22, 2023, alleging that by

authorizing wolf and coyote trapping and snaring in grizzly bear habitat,

Defendants are violating § 9 of the ESA, as that authorization has caused the

unlawful take of grizzly bears and is reasonably certain to cause the take of grizzly

bears in the future.  (Doc. 4.)  Plaintiffs seek preliminary injunctive relief under

Rule 65 of the Federal Rules of Civil Procedure, asking the Court to enjoin the

State's wolf trapping and snaring regulations before the season opens at the end of

November.  (Doc. 5.)  Plaintiffs' motion also requests the Court enjoin the trapping

7

and snaring of coyotes in grizzly bear habitat in Montana. (*Id.*) Defendants

oppose an injunction. (Doc. 19.)

ANALYSIS

Widely considered the "most comprehensive legislation for the preservation

of endangered species ever enacted by any nation," Congress's express intent in

enacting the ESA was "to halt and reverse the trend toward species extinction—

whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184. "Section 9 of the ESA

establishes a blanket prohibition on the taking of any member of a listed

endangered species[,]" *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th

Cir. 2007) (citing 16 U.S.C. § 1538(a)(1)(B)), unless the take is authorized by the

relevant federal agency in an incidental take statement, 16 U.S.C. § 1539.

A preliminary injunction is an extraordinary remedy never awarded as a

matter of right, but only "upon a clear showing that the plaintiff is entitled to such

relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Injunctive relief is available for a § 9 violation. 16 U.S.C. §§ 1538(a)(1)(B),

1540(g)(1). "Congress intended for courts to be guided by a policy of

'institutionalized caution' when confronted with requests for injunctive relief

regarding listed species under the ESA." *Native Ecosystems Council v. Marten*,

334 F. Supp. 3d 1124, 1130 (D. Mont. 2018) (quoting *Cottonwood Envt'l Law Ctr.*

*v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015)).

8

Generally, Plaintiffs seeking a preliminary injunction must show that: (1) they are likely to succeed on the merits of their claim; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. In considering these factors, the Ninth Circuit employs "a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 and 1135 (9th Cir. 2011)). "Serious questions" on the merits "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits" and "present a fair ground for litigation and thus for more deliberative investigation." *Marten*, 334 F. Supp. 3d at 1130 (internal citations and quotations omitted); *see e.g., Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 624 (9th Cir. 2017) (holding in a non-precedential opinion that the "serious questions" standard was met where the district court found both parties plausibly relied on qualified experts who differed on whether a taking will occur).

9

Consistent with Congress's intent to afford endangered species "the highest of priorities," *Tenn. Valley Auth.*, 437 U.S. at 174, "[w]hen considering an injunction under the ESA, [courts] presume that . . . the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction," *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018). Accordingly, Plaintiffs in this case must demonstrate they have presented serious questions as to the merits of their ESA claim and that absent an injunction, irreparable harm is not only possible, but likely. *Cottrell*, 632 F.3d at 1135. Because Plaintiffs have met that burden here, their request for preliminary injunctive relief is granted, in part, as explained below.

## I.   Likelihood of Success on the Merits

First, to prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's "sliding scale" test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20 (likelihood of success); *Cottrell*, 632 F.3d at 1135 (serious questions). Section 9 of the ESA prohibits states from authorizing activities that are reasonably likely to "take" members of a listed species. *See* 16 U.S.C. § 1538(a)(1)(B) (prohibiting "any person" from "tak[ing] any [listed endangered] species within the United States"); *id.* § 1532(13) (defining "person"); 50 C.F.R.

§ 17.31(a) (extending protections to threatened populations); *see Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) (holding "the ESA [ . . . ] prevents activity that will cause future harm").

The ESA broadly defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "A take may involve a past or current injury, or the prospect of an imminent threat of harm to a protected species." *All. for the Wild Rockies v. U.S. Dep't of Ag.*, 772 F.3d 592, 605 (9th Cir. 2014). "Injury can mean pain or stress, which trapping undoubtedly causes even when [listed animals] are released with no physical indication of harm." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 342 F. Supp. 3d 1047, 1065–66 (D. Mont. 2018). "Serious injury may not always be immediately visible or ascertainable and even minor injuries can impair post-release survival." *Id.* (internal citations omitted). Trapping or capturing an endangered species is an unlawful "take" even if the action does not cause injury or mortality. *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 98 (D. Me. 2008) ("[E]ven if a lynx is harmlessly trapped, it has been subject to a prohibited take under the statute.").

State-authorized recreational trapping violates the ESA when "a risk of taking exists [even] if trappers comply with all applicable laws and regulations in place." *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1079 (D. Minn. 2008)

11

(citing *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997) *cert. denied*, 525 U.S. 830 (1998) (holding that Massachusetts, through its commercial fishing licensing scheme, was liable under the ESA for the incidental taking of Northern Right whales)); *Red Wolf Coal. v. N. C. Wildlife Res. Comm'n*, 2014 WL 1922234, at *8–9 (E.D. N.C. May 13, 2014) (enjoining coyote hunting in a red wolf recovery area because, "by authorizing coyote hunting during all seasons and at any time day or night, the Commission has increased the likelihood that a red wolf will be shot, or that a breeding pair will be dismantled or a placeholder coyote killed" and "may [ . . . ] be liable for the unauthorized takes of red wolves where its actions have greatly increased the likelihood of the take"); *see also Pacific Rivers Council v. Or. Forest Indus. Council*, 2002 WL 32356431, at *11 (D. Or. Dec. 23, 2002) (finding the state forester's authorization of logging operations that are likely to result in a take is itself a take); *Palila v. Hawaii Dep't of Land and Nat. Resources*, 639 F.2d 495, 497–98 (9th Cir. 1981) (holding the state's practice of maintaining feral goats and sheep in the Palila bird's habitat was a taking).

Here, Plaintiffs argue past trapping bycatch in Montana and its neighboring states of Idaho and Wyoming, as well as in Alberta and British Columbia, show that where wolf and coyote trapping occurs, grizzly bears are incidentally captured and harmed. Plaintiffs submit declarations from grizzly bear biologists, which they argue establish (1) an increase in both the number of grizzly bears captured by

12

traps or snares in recent years, and (2) an increase in the number of bears with "trap-like injuries" since wolf trapping was legalized in Montana—injuries inconsistent with those grizzly bears typically suffer in the wild. (*See* Docs. 6-6 at ¶¶ 6–12; 22 at ¶¶ 6–7; 24 at ¶ 16.)  Additionally, Plaintiffs contend the Commission's new rules further incentivize and expand trapping and snaring statewide, thus increasing the likelihood that grizzly bears will be caught in traps and snares.  This is compounded by the doubling of the number of wolves that can be trapped by an individual, from five to ten within the season.

Defendants argue the State's trapping regulations mitigate the non-target capture of grizzly bears, highlighting (1) its "scientifically sound map of the 'estimated occupied range of grizzly bears,'" (2) the floating season start date, (3) restrictions on snaring in Lynx Protection Zones, and (4) other requirements related to snare breakaway devices and trap monitoring windows.  Defendants maintain that Plaintiffs overstate the harm to grizzly bears that has been caused by trapping in Montana.  They argue there have been no confirmed instances of a bear caught in a public (i.e., non-research) wolf trap since the summer of 2013 (which is outside the trapping season), and no grizzly bears have been incidentally captured in a public trapper's wolf trap since the Commission implemented the floating start date in 2021.

13

Based on the current record, Plaintiffs have, at a minimum, raised serious questions going to the merits of their § 9 claim.  As discussed further below, Defendants' attempt to exclude relevant past evidence of grizzly bears that have been caught in wolf and coyote traps across the region is unpersuasive.  While Defendants may be correct that there have been no confirmed reports of grizzly bears caught in recreational wolf traps in Montana since 2013, the precise harm at issue in this case has been well-documented in Montana and adjacent states and provinces that share the home ranges of Montana's grizzly bear populations.  (*See, e.g.*, Doc. 20 at 15 (documenting four grizzly bears with trap-like injuries observed *outside* of grizzly bear recover zones in Montana in 2021 alone).)  Further, Defendants have failed to show that the State's mitigation measures are as effective in practice as in theory.  (*See, e.g.*, Docs. 21 (responding to the declarations of Nathan Kluge, Doc. 19-3, and Ken McDonald, Doc. 20); 22 (responding to Kluge); 23 (responding to Kluge, McDonald, and Cecily Costello, Doc. 19-3); 25 (responding to Kluge).)  When, as here, reasonable legal positions on either side conflict, "[t]he ESA requires that protected species be given the benefit of the doubt in management decisions."  *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 877 (D. Mont. 2021).

On the other hand, the increasing prevalence of grizzly bears with "trap-like" injuries in Montana and elsewhere is persuasive evidence that the

14

Commission's new regulations, which expand both the length of the trapping season and the geographic areas in which wolf trapping can occur, will only increase the likelihood that grizzly bears are subject to illegal takes in the future. These takes are reasonably certain even "if trappers comply with all applicable laws and regulations in place," and thus would be directly attributable to Defendants' authorization of the State's trapping and snaring rules and regulations. *Animal Prot. Inst.*, 541 F. Supp. 2d at 1079. This is particularly true when it comes to coyote trapping and snaring, which, for Montana residents, is unregulated, unlimited in scope, and entirely untracked by any state agency.

Therefore, Plaintiffs have met their burden of showing at least serious questions as to the merits of their § 9 claim, satisfying the first *Winter* prong.

## II.  Irreparable Harm

Second, to obtain a preliminary injunction, a plaintiff must allege more than the possibility of harm, *Winter*, 555 U.S. at 22, but "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs," *Cottonwood*, 789 F.3d at 1091 (citing 16 U.S.C. § 1531). A "reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA." *Marbled Murrelet*, 83 F.3d at 1066. Past takings of ESA-protected species are "instructive,

15

especially if there is evidence that future similar takings are likely." *Nat'l Wildlife Fed'n*, 23 F.3d at 1512; *Animal Prot. Inst.*, 541 F. Supp. 2d at 1080 (finding future take reasonably certain because data from earlier years showed take and trapping regulations remained substantially the same); *see also Nat'l Wildlife Fed'n*, 886 F.3d at 823 (holding that a plaintiff "need not further show that the action sought to be enjoined is the exclusive cause of the injury").

Here, Plaintiffs argue that preliminary injunctive relief is essential to avoid irreparable harm to Montana's grizzly bears' and Plaintiffs' members' interests. Defendants counter that Plaintiffs fail to show irreparable harm because the precise harm that Plaintiffs anticipate has not been documented in Montana since 2013 and has never occurred under the current regulations. Plaintiffs have the better argument.

First, Plaintiffs present evidence that nearly 40% of the grizzly bears in Montana have historically been active outside their dens after November 27 or before March 15, and they convincingly argue that this trend is likely to increase due to a warmer winter climate. (Doc. 6-1 at ¶¶ 12–15.) Plaintiffs logically contend this decrease in denning activity and increase in the grizzly bear's wider geographical distribution in recent years further increases the risk that grizzly bears will be subject to accidental capture and injury if trapping and snaring activities proceed under the current regulations.

16

Next, Plaintiffs argue that because Montana's regulations permit baited trapping and snaring during the months of peak consumption of meat by grizzly bears when other food sources are scarce, grizzly bears are particularly likely to be drawn to the baits and scented lures intended to attract wolves to traps and snares. (Docs. 6-1 at ¶¶ 16–26; 6-2 at ¶¶ 8–10; 6-5 at ¶ 10.)  As grizzly bears often scavenge wolf kills, Plaintiffs' experts claim that grizzly bears are likely to be active in areas frequented by wolves, and by extension, they are likely to be active in the same areas targeted by wolf trappers.  (Docs. 6-1 at ¶¶ 17–20; 6-6 at ¶ 13.) Plaintiffs experts conclude that the State's current regulations are reasonably certain to result in increased incidences of accidental capture and harm to grizzly bears because the new rules expand and incentivize wolf trapping in the State, increasing the likelihood that traps will be set in areas occupied by non-denning grizzly bears.

Plaintiffs further support their position with evidence of 21 unique instances in Montana where grizzly bears were caught in traps and snares targeting other animals since 1988.  (*See* Doc. 6-3 at ¶ 13.)  Plaintiffs provide additional anecdotal reports of grizzly bears being caught in traps and snares and photographs and testimony about bears with injuries likely attributable to unreported instances of grizzly bears caught in traps and snares.  (Docs. 6-6 at ¶¶ 6–12; 21 at ¶ 5; 22 at ¶ 7; 23 at ¶ 9 (noting that only 12% of unpermitted grizzly bear killings are actually

17

reported).)  Plaintiffs argue this evidence "sufficiently demonstrates the likelihood of future take" because the 2023 regulations are less protective, both temporally and spatially, for non-denning grizzly bears.

Defendants counter that this evidence is "irrelevant" because many of the instances Plaintiffs present occurred outside of Montana, including in British Columbia, Canada, where the trapping regulations are "less restrictive" than in Montana.  (Doc. 19 at 24.)  Defendants are incorrect.  Plaintiffs' evidence is relevant.  Grizzly bears have wide home ranges and populations are not limited to geographical borders.  (Doc. 21 at ¶ 5.)  Further, many of the disputed trap injuries outside of Montana were documented within the Cabinet-Yaak and Northern Continental Divide ecosystems, and some only a few kilometers from the State's borders.  (*Id.*)

The Court also declines to rely on Defendants' unsupported claim that British Columbia's trapping regulations are less restrictive than Montana's.  While the record does not contain any detailed analysis of the trapping regulations in British Columbia, Idaho, or Wyoming, Plaintiffs point out that, in at least one respect, the regulations in British Columbia are actually more restrictive than Montana's.  (Doc. 21 at ¶ 4 (testifying that unlike in British Columbia where the openings on cubby boxes are limited to 3.5 inches, or a maximum of 12.25 square inches, Montana continues to allow openings on cubby boxes up to 52 square

18

inches).)  Notably, Defendants have likewise asserted that Montana's current regulations are "less restrictive" than its prior regulations.  (*See* Doc. 19 at 6.)  But, as previously discussed, Montana's current regulations both (1) reduce the geographic area where wolf trapping and snaring is subject to the floating start date, thus expanding the area where it is permitted to begin as early as the Monday after Thanksgiving, and (2) expand the timeframe in which trapping and snaring is permitted in the spring by extending the season's default end date from February 28 to March 15.

In support of their argument, Defendants heavily rely on *Center for Biological Diversity v. Little*, 622 F. Supp. 3d 997, 1008 (D. Idaho 2022).  In *Little*, the court declined to enjoin Idaho's wolf trapping regulations after finding the plaintiffs had not met their burden of showing hunter compliance with Idaho's wolf snaring and trapping laws and regulations was reasonably likely to result in the taking of grizzly bears.  *Id.*  Defendants' reliance on *Little* is misplaced.  In addition to being non-precedential, the record evidence in this case sufficiently establishes a likelihood of reasonably certain irreparable harm to grizzly bears.

Defendants acknowledge that grizzly bears have been caught in public wolf and coyote traps in Montana.  (Doc. 20 at ¶¶ 14–16.)  This fact is undisputed.  In 2021 alone, Montana bear biologists noted four different bears with missing body

parts, including forelegs and toes, likely due to trapping.[3]  (Docs. 20 at ¶¶ 15–16; 6-6 at ¶¶ 6–11.)  Grizzly bears are moving into areas of Western and Central Montana, (Doc. 19-4 at ¶ 16)[4], and are more active outside of their dens during the shoulder seasons due to climate change, (Doc. 6-1 at ¶ 15).  Therefore, it is reasonably certain that more grizzly bears in Montana will be out and about during the time period and in the locations that wolf trapping is permitted under Montana's 2023 regulations.

As discussed above, Defendants' arguments that its mitigation measures, like its floating start date, requirements like trap weight limits and breakaway devices, and making new trappers take a trapper education course will eliminate the likelihood of any future accidental capture of grizzly bears is unconvincing. Plaintiffs persuasively argue that the floating start date is potentially flawed due to a limited sample size of grizzly bears denning in a limited geographic area.  (*See* Docs. 21 at ¶¶ 2–3; 22 at ¶ 5; 24 at ¶ 10.)  The record evidence that grizzly bears have been caught in wolf traps—and in coyote traps, which are smaller and have a lower breakaway weight limit than wolf traps—is overwhelming.  (*See, e.g.*, Doc. 29 (evidence that a 750-pound grizzly bear was caught in a wolf trap on the

---

[3] Defendants argue that because they cannot say with certainty that these injuries were caused by trapping they should not be considered.  However, Plaintiffs' experts provide sufficient support for their position.

[4] *See also* Brett French, *Grizzly bear photographed in Upper Missouri River Breaks*, Missoulian (Nov. 20, 2023), https://perma.cc/F2D7-LHGC.

Flathead Indian Reservation and was unable to free itself despite the weight

restrictions on the trap).)  And despite having passed a trapper education course,

new recreational trappers are likely to be less experienced than professional

trappers, meaning an increase in the number of recreational trappers may very well

present a higher risk of non-target capture in general.  (Doc. 6-3 at ¶ 21.)

Finally, the letter from Director Williams, (Doc. 27-1), expressing concern

about Montana's recently passed legislation is compelling evidence that the State's

authorization of wolf trapping and snaring is at least *potentially* problematic for the

survival of the species, particularly when assessed in the context of the State's

entire regulatory regime, (*see* Doc. 27-2 (listing relevant laws passed in 2021 that

35 local wildlife experts believe "sabotages sound wildlife management" in

Montana)).

Because the substantial body of evidence Plaintiffs present leads to the

logical conclusion that future takes of grizzly bears in legal wolf and coyote traps

are reasonably certain under the State's current regulatory scheme, Plaintiffs have

shown irreparable harm sufficient for a preliminary injunction.

## III.   Defendants' Additional Arguments

Plaintiffs have satisfied their burden on the final two *Winter* elements

because "[w]hen considering an injunction under the ESA, [courts] presume

that . . . the balance of interests weighs in favor of protecting endangered species,

21

and that the public interest would not be disserved by an injunction." *Nat'l Wildlife*

*Fed'n*, 886 F.3d at 817.  Ignoring this presumption, Defendants make two

additional arguments as to why this Court should not enjoin the State's wolf and

coyote trapping and snaring seasons under the *Winter* test.

First, Defendants argue the balance of equities and public interest do not

support injunctive relief because "the Montana Legislature has made it very clear

that the Montana public wants wolf trapping, specifically including the use of

snares, to lower the wolf population in Montana."  (Doc. 19 at 25.)  This argument

fails because Congress has afforded endangered species "the highest of priorities"

and a state's public interest can never be at odds with the ESA.  "By including the

states in the group of actors subject to the [ESA's] prohibitions, Congress

implicitly intended to preempt any action of a state inconsistent with and in

violation of the ESA." *Strahan*, 127 F.3d at 168; *see* 16 U.S.C. § 1535(f).

Second, because trapping and snaring have been permitted in Montana since

2012, Defendants argue that Plaintiffs are asking for a mandatory injunction, which

requires a higher standard to alter the status quo.  Courts have a "responsibility

under [the ESA] to preserve the status quo where endangered species are

threatened, thereby guaranteeing the legislative or executive branches sufficient

opportunity to grapple with the alternatives." *Tenn. Valley Auth.*, 437 U.S. at 169

(quoting *Hill v. Tenn. Valley Auth.*, 549 F.2d 1064, 1070 (6th Cir. 1977)).

22

Defendants are incorrect that the "status quo" in this case is Montana's trapping tradition. The status quo is grizzly bear recovery and the protections afforded to grizzly bears by their threatened status under the ESA.

In sum, because state-authorized recreational trapping violates the ESA when "a risk of taking exists [even] if trappers comply with all applicable laws and regulations in place," *Animal Prot. Inst.*, 541 F. Supp. 2d at 1079, and because Plaintiffs have established there is a "reasonably certain threat of imminent harm" to grizzly bears that will likely be active in areas open to coyote and wolf trapping and snaring during Montana's current seasons, an injunction under § 9 of the ESA is warranted, *Marbled Murrelet*, 83 F.3d at 1066.

## IV.  Remedy

"The ESA governs the relief available in a citizen suit and authorizes citizen suits to enjoin acts in violation of the ESA." *Strahan*, 127 F.3d at 170 (citing 16 U.S.C. § 1540(g)(1)(A)). "[I]njunctive relief must be tailored to remedy the specific harm alleged." *Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). District courts must "identify[] [the] harm to [the] protected species" and "craft[] an injunction to remedy the precise harm." *Cottonwood*, 789 F.3d at 1091.

Here, the Plaintiffs seek an injunction for all coyote and wolf hunting and trapping in grizzly bear habitat in Montana under the specific regulations adopted

by the Commission in August 2023. Plaintiffs ask the Court to limit wolf and coyote trapping and snaring in all areas "west of Billings" to the time period when it is reasonably certain that almost all grizzly bears will be in dens: January 1, 2024, to February 15, 2024. (Doc. 27 at 14.) Defendants argue that in the event the Court determines an injunction is warranted based on the Commission's approval of the 2023 regulations, the status quo would require a return to the 2022 regulations. Plaintiffs have the better argument. However, Plaintiffs' requested relief is complicated by Montana's vastly different regulatory schemes for wolves and coyotes and the absence of any legal argument by either party regarding the State's coyote trapping and snaring regime.

Although the Court finds that Plaintiffs have shown widespread coyote trapping throughout grizzly bear habitat in Montana likely presents a significant risk of a grizzly bear take in violation of the ESA, Plaintiffs' have not sufficiently tied the harm alleged to the regulations at issue in this case. Accordingly, for the purposes of this injunction, Plaintiffs have not identified a remedy appropriately tailored to the specific harm caused by coyote trapping and snaring in Montana.

**V.    Bond**

Although preliminary injunctions are generally subject to bond, *see* Fed. R. Civ. P. 65(c), "[i]t is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on

litigation to protect the environment and the public interest," *Central Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond." *Id.* Accordingly, no bond should be required here.

## CONCLUSION

Accordingly, IT IS ORDERED that Plaintiffs' motion for preliminary injunctive relief (Doc. 5) is GRANTED in part and DENIED in part. While this action is pending, Montana Fish, Wildlife and Parks is ENJOINED from authorizing wolf trapping and snaring in all areas included in wolf regions one through five, plus Hill, Blaine, and Phillips counties, except during the time period when it is reasonably certain that almost all grizzly bears will be in dens: January 1, 2024, to February 15, 2024.

DATED this 21st day of November, 2023.

16:17 P.M.

Donald W. Molloy, District Judge
United States District Court