**Sarah Clerget** (Mont. Bar No. 11897)
Chief Legal Counsel
**Alexander Scolavino** (Mont. Bar No. 68806621)
Montana Fish, Wildlife and Parks
1420 East Sixth Avenue
P.O. Box 200701
Helena, MT 59620-0701
(406) 594-9023; (406) 594-8050
sclerget@mt.gov; alexander.scolavino@mt.gov
*Attorneys for Montana Fish, Wildlife and Parks*
*On behalf of Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA,
## MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD-LOLO-BITTERROOT CITIZEN TASK FORCE and WILDEARTH GUARDIANS, | Case No. CV 23-101-M-DWM |
| Plaintiffs, | **DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| STATE OF MONTANA, LESLEY ROBINSON, and GREG GIANFORTE, | |
| Defendants, | |
| and | |
| MONTANA TRAPPER ASSOCIATION and OUTDOOR HERITAGE COALITION, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................................II

TABLE OF AUTHORITIES ................................................................................ IV

EXHIBIT LIST .................................................................................................... VI

AFFIDAVIT LIST ............................................................................................... VI

INTRODUCTION ..................................................................................................1

BACKGROUND ....................................................................................................1

SUMMARY JUDGMENT STANDARD ................................................................2

ARGUMENT .........................................................................................................3

   I.  THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION..3

  II.  THERE IS A GENUINE DISPUTE OF MATERIAL FACT. ......................9

      A.   There are not 27 verified records of incidentally captured grizzly bears. ..................................................................................................10

      B.   Four records of incidental grizzly bear capture in 2021 cannot prove harm by Montana traps. .........................................................14

      C.   USFWS authorized the six additional instances of grizzly bear captures cited by Plaintiffs. ............................................................15

      D.   The State's Wolf Snaring Regulations Prevent Incidental Take of Grizzly Bears. ......................................................................................17

      E.   Bears are not always active during the wolf trapping and snaring season. ...................................................................................................18

      F.   The State's sample size is sufficient, and the sample and grizzly bear assessment allows the state to infer grizzly bears are denned. ..............21

      G.   Ending the wolf trapping season February 15th is too early. .................22

  III. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW....................................................................................23

      A.  Plaintiffs cannot prove the state's wolf trapping and snaring regulations are reasonably certain to result in incidental take of grizzly bears........24

         1.   Recognition that incidental take of grizzly bears may occur does not equate to "reasonable certainty."     25

         2.   Incidental take outside of Montana does not create "reasonable certainty" in Montana.     26

3.  While baits or lures may attract grizzly bears, the use of baits or lures does not lead to incidental take, nor establish "reasonable certainty."   26

B.  It is unclear how this court can provide the Plaintiffs the relief they seek with regard to coyote trapping. ...........................................................27

CONCLUSION.........................................................................................28

CERTIFICATE OF COMPLIANCE.......................................................29

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)................................................3

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ........................................................4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................2

*Conservation Force v. Salazar*, 715 F. Supp. 2d 99 (D.D.C. 2010)........................9

*Cottonwood Envt'l Law Ctr v. U.S. Forest Svc.*, 789 F.3d 1075 (9th Cir. 2015)....26

*Ctr. for Envtl. Sci., Accuracy & Reliability v. Sacramento Reg'l Cnty. Sanitation Dist.,* No. 1:15-cv-01103 LJO BAM, 2016 U.S. Dist. LEXIS 72840 (E.D. Cal. June 3, 2016) ........................................................................................................6

*Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 1999) ..............................26

*eBay Inc. v. MercExchange,* L.L.C., 547 U.S. 388 (2006).....................................26

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, No. 23-3754, 2024 U.S. App. LEXIS 9778 (9th Cir. Apr. 23, 2024) ..................................... 1, 8, 13, 14, 25

*Forest Conservation Council v. Espy*, 835 F. Supp. 1202 (D. Id. 1993)..................5

*Friends of Animals v. Ashe*, 51 F.Supp 3d 77 (D.C. Cir. 2014) ...............................9

*Friends of Animals v. Salazar*, 670 F. Supp. 2d 7 (D.D.C. 2009) ...........................9

*Friends of the Wild Swan v. Christiansen*, 995 F. Supp. 2d 1197 (MT Dist. 2013) ......................................................................................................8

*Hallstrom v. Tillamook County,* 493 U.S. 20 (1989)............................................4, 5

*Kern County Farm Bureau v. Bagdley*, 2002 U.S. Dist. LEXIS 24125, 2002 WL 34236869 ............................................................................................................9

*Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375 (1994)................3, 4

*Lone Rock Timber Co. v. U.S. Dept. of Interior,* 842 F. Supp. 433 (D. Or. 1994)....4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ...............3

*Moden v. United States Fish & Wildlife Service,* 281 F. Supp. 2d 1193 (D. Or. 2003)..................................................................................................................9

*Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996)..............................26

*Nat. Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985 (9th Cir. 2000)...............6

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 886 F.3d 803 (9th Cir. 2018) ..........................................................................................................................26

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515 (9th Cir. 1998) .............................................................................................. 4, 5, 8

*United States v. Cotton*, 535 U.S. 625 (2002)..........................................................4

**Statutes**
§ 81-7-101, MCA ......................................................................................................7

§ 81-7-102, MCA .......................................................................................... 8, 29, 30

§ 87-1-304, MCA ....................................................................................................20

§ 87-6-208, MCA ......................................................................................................8

16 U.S.C. § 1540 ...................................................................................................4, 5

**Rules**
Fed. R. Civ. P. 12 ....................................................................................................4

Fed. R. Civ. P. 26 ..................................................................................................11

Fed. R. Civ. P. 56 ............................................................................................. 2, 10

Fed. R. Evid. 701 ...................................................................................................11

**Regulations**
50 C.F.R. § 17.40 ...................................................................................................14

## EXHIBIT LIST

Exhibit A: 60-day Notice of Intent to Sue

## AFFIDAVIT LIST


Declaration of Erik Wenum

Second Declaration of Nathan Kluge

Declaration of Lori Roberts

## INTRODUCTION

Defendants, State of Montana, Lesley Robinson, and Greg Gianforte (collectively, "the State") hereby file their response in opposition to Plaintiff's Motion for Summary Judgment ("MSJ") (Doc. 56). Plaintiffs' MSJ should be denied as Plaintiffs are not entitled to judgment as a matter of law, and there remains a genuine issue of material fact.

## BACKGROUND

This case stems from Plaintiff's suit challenging the State's regulatory structure regarding coyote and wolf trapping and snaring seasons. On November 21, 2023, this Court entered an order granting the Plaintiff's request for a preliminary injunction limiting wolf trapping ("Order"). Doc.33.

Shortly thereafter, the State appealed the Order (Doc. 34). The State and Plaintiff's appeared before the Ninth Circuit Court of Appeals ("Ninth Circuit") on January 12, 2024. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, No. 23-3754, 2024 U.S. App. LEXIS 9778 (9th Cir. Apr. 23, 2024). At that point, the wolf trapping and snaring season was already underway and continued until February 15, 2024, in compliance with this Court's Order. On April 23, 2023, the Ninth Circuit affirmed this Court's issuance of the preliminary injunction but remanded this Court to reconsider the geographic scope of the preliminary injunction (Doc. 58). On April 25, 2024, this Court entered an Order requiring the

State and Plaintiffs to "file a stipulation as to the appropriate scope of the injunction or simultaneous briefs…stating the geographical scope necessary to prevent the unlawful "take" of grizzly bears." ([Doc. 60](#)).

Plaintiffs now seek to expand this Court's injunction to prohibit not only wolf trapping and snaring, but also prohibit coyote trapping and snaring (except from January 1 to February 15), the latter of which Plaintiff's did not seek relief for in their Amended Complaint. ([Doc. 4](#)).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets its burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the court is making its

determinations, the court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *Id.* at 587.

## ARGUMENT

## I. THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION.

This Court lacks subject matter jurisdiction over the entire case, because the Plaintiffs, in their 60-day notice of intent to sue: 1) failed to notify the Secretary of the Department of Interior; 2) failed to articulate any alleged violation relating to coyotes; 3) failed to notify the Montana Department of Livestock ("MDOL"); and 4) remitted the notice of intent to sue prior to the approval of the 2023-2024 Furbearer, Wolf, and Trapping Regulations.

Federal courts have limited jurisdiction and as a result only possess power authorized by Article III of the United States Constitution and statutes enacted by Congress. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). "[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing *United States v. Cotton*, 535 U.S. 625, 630 (2002)). All courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Id.* "The objection that a federal court lacks subject-matter jurisdiction…may be raised by a party, or by a court on its own initiative, at any stage in the litigation even after trial and the entry

of judgment." *Id.* at 506. The court, in effect, presumes lack of jurisdiction unless the asserting party can prove otherwise. *Kokkonen,* 511 U.S. at 377. If the Court determines that it lacks subject-matter jurisdiction at any time, it must dismiss the action. Fed. R. Civ. P. 12(h)(3).

Pursuant to section 1540(g) of the Endangered Species Act ("ESA"), a citizen may not bring suit prior to sixty days after written notice of an alleged violation has been given to the Secretary, and to the alleged violator." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) (citing 16 U.S.C. § 1540(g)(2)(A)(i)). "[F]ailure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Id.* (citations omitted).

"The purpose of the 60-day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to renew their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation." *Id.* at 520 (quoting *Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1210 (D. Id. 1993), *aff'd* 42 F. 3d 1399 (9th Cir. 1994)).

Here, Plaintiffs failed to notify the Secretary of the Department of Interior ("SOI") of the 60-day notice of intent to sue. As noted above, 16 U.S.C. § 1540

requires notice be provided "to the **Secretary**, **and** to any **alleged violator**." 16 U.S.C. § 1540(g)(2)(A)(i) (emphasis added). Plaintiffs 60-day notice of intent to sue was provided to the following parties: Martha Williams, U.S. Fish and Wildlife Service ("USFWS") Director; Hilary Cooley, USFWS Grizzly Bear Recovery Coordinator; Governor Greg Gianforte; and Montana Fish, Wildlife and Parks' ("FWP") former Director, Hank Worsech.

As this Court is well aware, the Supreme Court of the United States ("SCOTUS") and the Ninth Circuit Court of Appeals ("Ninth Circuit") require strict compliance with ESA notice requirements and other citizen suit provisions. The SCOTUS has stated that citizens suits are "like any other lawsuit, generally filed by trained lawyers who are presumed to be aware of statutory requirements…it is not unfair to require strict compliance with statutory conditions precedent to suit." *Hallstrom*, 493 U.S. at 28. The Ninth Circuit has found that notice of citizen suits under the Clean Water Act require "strict compliance." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000).

The California Eastern District Court recently dealt with a similar issue regarding citizen suits. In *Ctr. for Envtl. Sci., Accuracy & Reliability v. Sacramento Reg'l Cnty. Sanitation Dist.*, Judge O'Neill determined that "Plaintiff failed to notify the SOI of its intention to bring the above-captioned suit, as required by the ESA. Because Plaintiff fails to provide evidence showing that such

notice was given, it also fails to 'satisfy its burden of establishing subject matter jurisdiction.'" *Ctr. for Envtl. Sci., Accuracy & Reliability v. Sacramento Reg'l Cnty. Sanitation Dist.,* No. 1:15-cv-01103 LJO BAM, 2016 U.S. Dist. LEXIS 72840 at *17 (E.D. Cal. June 3, 2016). The failure to notice the SOI resulted in dismissal. Although only prescriptive to this Court, the findings by SCOTUS and the Ninth Circuit are binding. Given Plaintiffs failure to notify the SOI, this case should be dismissed in its entirety for lack of subject-matter jurisdiction.

Second, Plaintiffs' notice of intent to sue failed to articulate any alleged violation relating to coyote trapping or snaring. The 60-day notice identifies three legal violations:

> FWS and the State [] are in violation of ESA § 9 by allowing unregulated illegal takings of grizzly bears in Montana as a result of **wolf and furbearer trapping seasons** administered by the State of Montana's [FWP].
> …
> FWS and the State [] are in violation of § 10 by failing to develop an approved Conservation Plan with required mitigation to offset impacts….

Ex. 1, at 3 (emphasis added)[1].

With respect to the third violation, the Plaintiffs assert that "[t]he State [] Furbearing Trapping Season and Regulations represent an illegal taking of grizzly bears outside of Recovery Zones and threaten natural connectivity of grizzly bear

---

[1] Given that this is the first mention of "furbearers," the State would like to highlight the fact that "coyotes" are not considered furbearers. Rather, they are deemed "predators." *See* § 81-7-101, MCA.

populations required for long term viability and sustained recovery." Ex. 1, at 11.

Despite articulating the violations, the Plaintiffs only mention coyotes two times

throughout the document, neither time asserting coyote trapping nor snaring to be

in violation of the ESA. *Id.* at 5, 8. Even if this Court were to consider Plaintiffs'

minimal mention of coyotes sufficient, Plaintiffs fail to state any alleged violation

as it relates to coyote trapping or snaring. Accordingly, Plaintiffs failed to

sufficiently notice the alleged violation and this Court lacks subject matter

jurisdiction.

Third, Plaintiffs failed to notice the MDOL. The MDOL retains authority

over predator control. *See* § 81-7-102, MCA ("shall conduct the destruction and

control of predatory animals"); *see also* § 87-6-208, MCA ("for predator control as

permitted by the department of livestock"). Given their authority, MDOL, as a

necessary party, should have been included in this lawsuit. Thus, even if this Court

found the Plaintiffs 60-day notice sufficient (as it relates to identifying an alleged

violation for coyote trapping), the Plaintiffs failed to identify MDOL as an "alleged

violator." *Friends of the Wild Swan v. Christiansen*, 995 F. Supp. 2d 1197, 1204

(MT Dist. 2013) (citing *S.W. Ctr. for Biological Diversity*, 143 F.3d at 522) ("the

notice must provide sufficient detail 'so that the Secretary or [alleged violator can]

identify and attempt to abate the violation.'").

Lastly, Plaintiffs notified the above-mentioned individuals/agencies that they intended to sue on May 9, 2023.[2] Three months later, the Montana Fish and Wildlife Commission ("Commission") instituted the 2023-2024 Furbearer, Wolf, and Trapping Regulations. The Plaintiffs, via their Amended Complaint (filed September 22, 2023), claim that the Commission's new rules "provide for an expanded wolf-trapping regime" and that Montana's "new rules further increase the trapping danger to grizzly bears by expanding wolf trapping and snaring in several aspects." Doc. 4, at ¶¶ 49, 51. By virtue of remitting the notice of intent to sue prior to the approval of the 2023-2024 Furbearer, Wolf, and Trapping Regulations, the Plaintiffs failed to provide the alleged violators with sufficient notice. *See Friends of Animals v. Ashe*, 51 F.Supp 3d 77, 86 (D.C. Cir. 2014) ("this Court joins the others around the country that have held that "pre-violation" notice of possible future violations is insufficient to satisfy the ESA's 60-day notice requirement") (citations omitted).

Given the above, the Plaintiffs' 60-day notice of intent to sue contains procedural defects that render the notice insufficient for purposes of this suit. Accordingly, this Court must dismiss the matter for lack of subject matter jurisdiction.

---

[2] The Defendant-Intervenors submitted an Amicus Curiae Brief in Support of Defendants-Appellants to the Ninth Circuit and argued this very point. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, No. 23-3754, 2024 U.S. App. LEXIS 9778 (9th Cir. Apr. 23, 2024); Doc. 11.1. The State incorporates Defendant-Intervenors argument by reference.

## II.     THERE IS A GENUINE DISPUTE OF MATERIAL FACT.

Plaintiffs have not met the requisite burden of demonstrating an absence of a genuine issue of material fact. In support of their MSJ, Plaintiffs primarily rely on the evidence they previously provided to this Court in support of their request for a preliminary injunction. That evidence amounts to mere speculation and the State has rebutted (and thus disputed) each of those speculative contentions. While speculative evidence may have been sufficient to support the issuance of a preliminary injunction (under the "serious questions" test), speculative evidence is not sufficient to warrant the issuance of a permanent injunction through summary judgment. The fact that the State has rebutted the Plaintiffs evidence firmly establishes that this case is not ripe for summary judgment (*i.e.*, there is a genuine dispute of material fact).[3] For purposes of brevity, the State incorporates by reference all of its prior briefing before this Court and the Ninth Circuit on these factual points.

As a threshold matter, most of the information relied on by the Plaintiffs is inadmissible as either hearsay (e.g., the news articles) or because of a lack of personal knowledge (e.g., how, when, and where grizzly bears missing extremities were harmed). Although (as the Ninth Circuit found) this evidence may be relied

---

[3] The Ninth Circuit stated that "the record reflects a genuine scientific and **factual** debate over whether Montana's 2023 recreational wolf trapping and snaring regulations will cause the unlawful 'take' of grizzly bears." *Id.* at 22.

on for the purpose of a preliminary injunction, it is not proper to rely on it for the purpose of summary judgment and the State objects to all of this evidence. *See* Fed. R. Civ. P. 56(c)(2), (4) (the evidence need be based on personal knowledge and in a form of admissible evidence to support the fact; *see also* SDF. Further, none of Plaintiffs declarants have been designated as experts, in compliance with Fed. R. Civ. P. 26. Therefore, any opinions they offer are, at best, lay opinions, which cannot go to the ultimate issue. Fed. R. Evid. 701. Finally, as lay/fact witnesses only, their testimony must be limited to personal experience, and they cannot testify to or incorporate hearsay—e.g. newspaper articles, journals, or studies done by others—for the truth of the matter asserted. *Id.* The Court therefore cannot rely on any of this hearsay, unless the declarants were personally involved in the data collection, did the research, or authored the document, and have laid proper foundation (as the State's witnesses have). Once hearsay is disregarded, and the Court looks only at the evidence about which witnesses have personal knowledge, the Plaintiffs have almost no evidence at all.

## A. There are not 27 verified records of incidentally captured grizzly bears.

Plaintiffs alter their argument to now state that there are 27 "verified" records of grizzly bears caught in recreational leghold traps or snares for coyotes and wolves (despite having previously admitted and sworn that there were 21). Doc. 56, at 13; *see also* Plaintiffs-Appellees' Answer Brief, Doc. 16.1, at 5, 12, 20,

25 (Plaintiffs acknowledging there were 21 "verified" records of grizzly bears caught in traps); Doc. 6-3, at ¶ 6; Doc. 6-7, at ¶¶ 6, 7 (Plaintiffs declarants admitting there are 21 "verified" records of incidental take). The State does not challenge that there have been 27 records of grizzly bears incidentally captured; however, the State does challenge the Plaintiffs' speculation that all 27 bears were the result of recreational trapping[4], and that all are "takes" in violation of the ESA. SDF at ¶ 70.

The attachment to Mr. McDonald's declaration portrays all 27 records and, in many instances, lists the "targeted species." Doc. 20, at 14-16. When reviewing each record's "targeted species" there are four potential sources of incidental take: 1) "[w]olf-monitoring;" 2) "[w]olf-WS (meaning Wildlife Services ("WS"), a federal program operating for research and depredation); 3) "public trapper;" and 4) those that lack an identifier. *Id.* Specifically, seven records are related to wolf monitoring (*i.e.* FWP research trapping), four are related to activities by WS, nine are related to public trapping, and seven lack identifiers. Given that seven lack identifying information, Plaintiffs cannot reasonably assert that there are "27 verified grizzly bears caught in leghold traps or snares set for coyotes and wolves in Montana." Doc. 56, at 13; *see also* Doc. 20, at 14-16; SDF at ¶ 70; Doc. 6-6, ¶ 6

---

[4] The State does not concede that all coyote trapping is "recreational" by nature. In many respects coyote trapping is used to remove conflict coyotes causing depredation. For purposes of this response and the use of the term "recreational" is intended to mean all non-research captures.

(Mr. Manley asserting he was "uncertain" of the cause of the missing toes and claws). Those traps could have been set for any furbearer, like martin or bobcat. Additionally, Record 14 was based on "unverified reports of a grizzly running around with a trap on its foot," and Record 18 was a presumed coyote trap – thus, lacking the ability to be "verified." Doc. 20, at 15; *see also* SDF at ¶ 164. In total, Plaintiffs are left with 18 "verified" instances of incidental take of grizzly bears.

Of the 18 confirmed instances of incidental capture, only two were within the December-March timeframe, during which recreational wolf trapping and snaring is currently allowed (*i.e.*, synonymous with FWPs floating start date). **One** of these captures was "verified" to be associated with a public wolf trapper (Record 12), and **one** was "verified" to be associated with a public coyote trapper (Record 15). *See* Doc. 20, at 14-16. Thus, at the most, the Plaintiffs could argue that there are two instances of take that occurred in the past that could have occurred under the State's floating start date. One of those instances happened over a decade ago, when the wolf trapping season's default opening date was December 15—not the 31 as it is now—and **before the floating start date existed**, which would have been prevented by the current regulations.[5]

---

[5] "Only a single bear on the provided list was caught by a recreational wolf trapper in 2013 during what is now wolf hunting season – a capture that predated Montana's introduction of the 'floating start date,' designed specifically to guarantee that incidental bycatch such as this take does not occur." *Flathead-Lolo Citizen Task Force, et al. v. State of Montana, et al.*, No. 23-3754, 2024 U.S. App. LEXIS 9778, at *46-47 (9th Cir. Apr. 23, 2024).

Of the remaining 16 confirmed instances of incidental capture, 11 were from FWP or WS staff involved in wolf monitoring and research (Records 1-4, 6-8, 13, 16, 19-20). These eleven grizzly bears were incidentally captured by staff, as well as WS, and, as a result, are exempt from incidental take.[6] SDF at ¶ 70. Further, one (Record 17) confirmed instance of coyote trapping occurred within the Confederated Salish and Kootenai Tribes reservation, which prohibits the hunting or taking, or attempting to hunt or take furbearers. *See* Flathead Indian Reservation Fish, Bird Hunting and Recreation Regulations, at 14 "Part V – Hunting and Trapping." (https://fwp.mt.gov/binaries/content/assets/fwp/commission/2023/feb/cskt/sd01_75 887_cskt_nonmember_guide-2022-23.pdf). Thus, Record 17 was an illegal trap and should not be considered. SDF at ¶ 163.

The remaining 4 instances (Records 5, 9, 10, and 11) all occurred within the "estimated occupied range of grizzly bears" – an important fact that the Plaintiffs fail to note, and before the wolf trapping start date. This means that FWP has appropriately estimated where the grizzly bears will be.

---

[6] *See* 50 C.F.R. § 17.40(b)(D); *see also* United States Fish and Wildlife Services Biological Opinion on the Effects of the Statewide Montana Wildlife Services' Integrated Wildlife Damage Management Activities on Grizzly Bears, 2012 and 2023 (exempting incidental take of grizzly bears under Section 7); *Flathead-Lolo Citizen Task Force, et al. v. State of Montana, et al.*, No. 23-3754, 2024 U.S. App. LEXIS 9778 at *34 (9th Cir. Apr. 23, 2024) (Plaintiffs do not object to clarifying that the injunction does not apply to government research activities); Doc. 45 (this Court clarifying that the preliminary injunction does not apply to wolf trapping and snaring for "scientific purposes").

At the very least, these facts (the dispute over 27 "verified" instances of incidental take of grizzly bears) raise substantial issues of fact preventing summary judgment. Furthermore, these facts raise doubt as to the Plaintiffs contention that the State's trapping and snaring regulations are "reasonably certain" to result in incidental take of grizzly bears (as discussed further below). Under the current regulatory structure, there has been absolutely zero incidental take of grizzly bears, and even applying the same regulatory structure to past incidents, there remains only two instances of incidental take - nonetheless, inside the "estimated occupied range of grizzly bears."

### B. Four records of incidental grizzly bear capture in 2021 cannot prove harm by Montana traps.

Tangentially related to the above, the Plaintiffs now argue that the four records from 2021 prove that grizzly bears have been harmed by traps in Montana. Doc. 56, at 17. That argument is without merit and couldn't be further from the truth. Mr. Timothy Manley states that he "captured" male grizzly bears missing toes yet cannot state with any certainty that those injuries were the result of traps. Doc 6-6, ¶ 6; *see also* Doc 19-3, at ¶ 12. Since the Plaintiffs cannot provide a declarant with personal knowledge of how these bears were injured, the Court must disregard any speculation about them.

As noted above, FWP is exempt from incidental take of grizzly bears for scientific purposes. SDF at ¶ 70. Mr. Manley stated that **he** "captured several adult

male grizzly bears." Doc. 6-6, at ¶ 6. Given that Mr. Manley was an FWP employee at the time, and the captures were done during research season, there are limited circumstances in which Mr. Manley could have set those traps. Those limited circumstances are as follows: 1) for wolf monitoring/research efforts; 2) for grizzly bear monitoring/research efforts; and 3) for depredation incidents involving grizzly bears. While Mr. Manley does not explicitly state the purpose for the traps, he does state that "I captured" the grizzly bears, which would infer that they were related to research efforts (and if they were not, then they were illegally set). *Id.* Accordingly, these four instances cannot count as "verified" instances of incidental take. SDF, at ¶ 163.

### C. USFWS authorized the six additional instances of grizzly bear captures cited by Plaintiffs.

Plaintiffs proffer new evidence that there are "at least six additional instances of grizzly bear captures that resulted in the death of the bears." Doc. 56, at 13. Specifically, Plaintiffs point to grizzly bear capture forms and mortality reports that were provided during the discovery period. Doc. 55-9. While there are six additional instances of grizzly bears being trapped, Plaintiffs fail to recognize that those instances were: 1) conducted by agency staff (FWP or WS), 2) that the trapping efforts/removals were authorized by the USFWS, and 3) not all six captures were the result of ground set traps or snares (one of them was the result of a culvert trap, with which Plaintiffs take no issue). Roberts Decl. SDF, at ¶ 71.

Given that grizzly bears are listed as a threatened species under the ESA, agency staff must receive USFWS permission prior to any actions (trapping, legal removal, etc.) being taken. These six instances were initiated because of depredating/conflict grizzly bears and in all six instances agency staff received USFWS' authorization to remove the bear. Roberts Decl.

Plaintiffs argue that in two of the six instances, grizzly bears "were euthanized due to injuries they had sustained that were likely caused by traps or snares" Asserting that the State is hiding trapping takes. Doc. 56, at 12. This is not true, and Plaintiffs incorrectly conflate the record. With respect to the first instance, the capture form indicates that the grizzly bear had an open wound on the back of its left foot. Doc 55-9, at 10. The capture form does not describe the severity of the injury or attribute the injury to a trap or snare. *Id.* Plaintiffs speculate, again with no actual, admissible evidence offered in support.

With respect to the second instance, Plaintiffs fail to include all of the remarks and rather point to only the first page of the document that supports their premise. While the capture form states, "snare laceration on foot," the "Notes, Sketches & Remarks" section, indicates that the laceration was "bet[w]een toes on same foo[t]." Doc 55-9, at 12. Even if this were an injury caused by an intentionally set snare (which the State does not concede, and which would have been illegally set given its occurrence in August 2019) there is **nothing** to indicate

a wolf or coyote snare set by a recreational trapper was the cause. Again, Plaintiffs have no admissible evidence to show that this injury was in any way related to recreational trapping.

Even when looking at the remaining 4 records, there is nothing that conclusively indicates a wolf or coyote snare set by a recreational trapper was the cause. Roberts Decl. Accordingly, it remains unclear how Plaintiffs can advocate that these two instances were the result of recreational traps. And again, at the very least there are substantial issues of material fact about them. In sum, neither the Plaintiffs nor this Court can point to these six instances as additional instances of "take," in violation of the ESA.

### D. The State's Wolf Snaring Regulations Prevent Incidental Take of Grizzly Bears.

Argument that "Montana has taken virtually no precaution to protect grizzly bears from the dangers of recreational wolf snaring," is without merit. *See* Doc. 56, at 13; *see also* Doc. 6-3, at ¶ 33. The State's wolf trapping regulations, through the estimated occupied range (tied to the floating start date), are specifically designed to prevent incidental take of grizzly bears and **have worked**. SDF, at ¶¶ 46, 60, 63.

Specifically, wolf snaring is **prohibited** on public lands within Lynx Protection Zones ("LPZs"). Doc. 19-3, at ¶ 6, 14; *see also* FWP's 2023 Wolf, Furbearer Trapping Regulations, at 15; SDF ¶ 63. While LPZs were established as part of a lynx litigation settlement to mitigate the potential of trappers capturing

lynx, the settlement is multi-purposed and assists to protect all species within the LPZs. Moreover, given that LPZs overlap 54% of the "estimated occupied range of grizzly bears," it is highly evident that the State has taken precautions to protect grizzly bears from recreational wolf snaring. Doc 19-3, at ¶ 6; SDF, at ¶ 63.

Most importantly, the State does not have a record of a grizzly bear incidentally captured in a snare **ever**. *See* Doc. 20, at 14-16 ("Grizzly Bears Incidentally Captured in **Traps**") (emphasis added); *see also* SDF, ¶¶ 65, 70, 148, 163, 178. In fact, the State has no record of a grizzly bear being snared, nor do the Plaintiffs have evidence that a grizzly bear was incidentally captured, injured, or killed from a wolf snare. SDF, ¶¶ 65, 70, 148, 163, 178. Accordingly, while the State's snaring regulations aren't directly aimed at always protecting grizzly bears, the State has taken precautions to limit incidental take of grizzly bears and the regulations are working to do just that – to limit the potential of incidental take of grizzly bears via wolf snares.

### E. Bears are not always active during the wolf trapping and snaring season.

During the preliminary injunction stage of this case, this Court lent much credence to Dr. Mattson's declaration, whereby Dr. Mattson stated that "nearly 40% of grizzly bears in Montana have historically been active outside of their dens either after November 27 or before March 15." Doc. 6-1, ¶ 12. At summary judgment, the Court cannot rely on this evidence, as it is hearsay. Dr. Mattson did

not collect or author it, and he has no personal knowledge of the facts on which the conclusion is based. SDF, at ¶ 39. Dr. Mattson is not a designated expert and cannot opine as to this or any other issue in the case on which he does not have personal knowledge. SDF, at ¶ 39. Again, the State objects to this evidence. SDF, at ¶ 39.

However, even if the Court were to consider this evidence, the State has ample evidence to show that Dr. Mattson's conclusion is undermined by the data.

First, the data that "Figure 2. Historical Denning Seasons & Temporal Exposure to Risk" presents does not encompass the State's floating start date. Doc. 55-4, 165:15-17; *see also* SDF, at ¶ 39. "Figure 2" illustrates a trapping season that begins the "first Monday after Thanksgiving until March 15." Doc. 6-1, at 4. While the State recognizes that the default opening date for wolf trapping **outside** estimated occupied range is the Monday after Thanksgiving, that is not the case **inside** estimated occupied range. In 2021, the Commission adopted a floating start date **inside** the **estimated occupied range of grizzly bears**, whereby the default start date for the wolf trapping and snaring season was December 31, and whereby the overall intent of such season was to prevent incidental capture of a grizzly bear in a wolf trap. Doc. 20, at ¶ 8; *see also* § 87-1-304(8), MCA (the Commission has the authority to "adjust dates for specific wolf management units based on regional

recommendations").[7] Given the fact that "Figure 2" doesn't account for the floating start date, Plaintiffs wholly misstate the percentage of bears that are out when the wolf trapping season begins. Doc. 55-4, 165:18-21; *see also* SDF, at ¶ 8.

Second, the data in "Figure 2" is outdated and representative of a sample size that may or may not include bears that denned in Montana – the Plaintiffs concern.[8] SDF, at ¶ 39. Both the Greater Yellowstone Ecosystem ("GYE") and the Cabinet-Yaak Ecosystem ("CYE") are not entirely situated in Montana. The GYE is primarily located within Wyoming and has a small portion in Idaho, leaving just 34% of its geographic boundary in Montana. Similarly, the CYE encompasses Montana, Idaho, and Canada. Thus, while each ecosystem has land and bears situated in Montana, it remains unclear whether the radiomarked bears that both authors relied on, represent den entry and exit dates of Montana bears. Doc. 55-4, 161:24-162:6.

Lastly, "Figure 2" does not represent the statistical uncertainty that arises from sampling. Doc. 55-4, 162:7-12; *see also* SDF, at ¶ 39. In fact, the Plaintiffs declarant, Dr. Mattson indicated that the bounds of that sample size includes a plus/minus "9 percent – 10 percent" amount of uncertainty. *Id.* at 162:22-24. Thus,

---

[7] The State acknowledges that the "floating start date" did not include a scientific review process or consider published scientific papers. However, the State finds no need for such, when the intent of the "floating start date" is to delay the wolf trapping season based upon scientific review of field data as it relates to grizzly bears.
[8] The State does not take argument with the sample size, but, rather, the fact that it is unclear whether the sample included bears that denned in the portions of those ecosystems located in Montana.

**DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT–**

accounting for the fact that "Figure 2" does not include the "floating start date" and could be 9-10% lower, it is evident that the 40% quickly dwindles.

**F.     The State's sample size is sufficient, and the sample and grizzly bear assessment allows the state to infer grizzly bears are denned.**

The State's sample size of grizzly bears, along with FWP's grizzly bear assessment, allows the State to accurately estimate when grizzly bears are denned. SDF, at ¶¶ 24, 26.

Since the inception of this case, Plaintiffs have complained that the State's grizzly bear sample size is "primarily dependent on radio telemetry," and because of that the State's "method" of determining when grizzly bears are denned is unreliable. However, Plaintiffs' overlook two important factors: 1) they overlook the fact that the data they rely on ("Figure 2") is based on a sample size of radio collared bears; and 2) they overlook the fact that the Grizzly Bear Assessment considers a multitude of factors, not just radio-collared bears.

As noted above (Point D), the studies for "Figure 2" are based on a sample size of radiomarked grizzly bears. Doc. 55-4, 161:24-162:6; *see also* SDF, at ¶ 39. As an example, Kasworm et al. 2021 utilized a sample size of 129 grizzly bears for the fall and 121 grizzly bears for the spring. Thus, the Plaintiffs cannot argue that the State's sample size is for determining the floating start date is too limited, when they too ask this Court to consider a sample size.

Moreover, the State's floating start date is based on the Grizzly Bear Assessment, which considers a multitude of methods that Montana's grizzly bear biologists and conflict specialists then use to recommend whether the wolf trapping season should begin. Doc. 20, at ¶ 10; *see also* SDF, at ¶¶ 24, 26. At times, the grizzly bear assessment could consider collared grizzly bears; however, at other times, the assessment could include public reports of grizzly bears or conflict situations where the grizzly bear biologists and conflict specialists verify the sighting(s). Doc 55-2, 15:1-8; *see also* SDF, at ¶¶ 24, 26. The State does not use one method, but, rather, uses all data inputs (radio-collared bears, calls, reports, conflicts, etc.) to formulate a real-time opinion as to whether their respective region should begin or delay wolf trapping. *Id.* at 22:11-23:5; *see also* SDF, at ¶¶ 24, 26. While the State can't conclusively determine that all bears are denned at a specific time, the State's staff can reasonably infer that nearly all grizzly bears are denned (through collar data and the fact that none are visible) prior to season commencement in the "estimated occupied range of grizzly bears." Doc. 19-4, at ¶ 14; *see also* SDF, at ¶¶ 20, 24, 26.

## G.    Ending the wolf trapping season February 15th is too early.

Plaintiffs advocate for a season spanning January 1 through February 15 based on "Figure 2." However, for reasons noted above (Section E), as well as for data provided via discovery those dates should not stand. SDF, at ¶¶ 8, 32, 33, 39.

For purposes of brevity, the State will not reiterate its argument made in Section E, *supra*. Rather, the State will focus on data it provided to the Plaintiffs, via discovery, which illustrates March 15 is reasonable and adequately safeguards grizzly bears. During discovery, Plaintiffs asked for "all data from 2015 to the present of grizzly bear den emergence in Montana." Doc 55-19, at 22. To comply with discovery, the State produced evidence of grizzly bear den exit dates for both the GYE and the NCDE. SDF, at ¶ 32. The **earliest** den exit date for GPS radio-collared grizzly bears in the NCDE was March 5. SDF, at ¶ 33.[9] Within those records, there are only six den exit dates that precede the March 15 end date to the wolf trapping and snaring season. Considering these limited den exits in relation to the total number of NCDE radio-collared grizzly bears (227), there is a .02% chance of a grizzly bear exiting its den prior to March 15. SDF, at ¶¶ 33, 39.

Similarly, the **earliest** den exit date for GPS radio-collared grizzly bears in the GYE was March 7. SDF, at ¶ 33. Those records show 2 den exit dates that precede the March 15 end date. Considering these minimal den exits in relation to the total number of exits (42), there is a .04% chance of a GYE grizzly bear exiting its den prior to March 15. SDF, at ¶¶ 8, 33, 39. In both the GYE and the NCDE,

---

[9] Given that GPS data is more accurate than VHF data, the State is opting to refer to the GPS data only for both the NCDE and GYE.

the bulk of the den exit dates exist in April. Thus, the State's March 15 end date to

wolf trapping is statistically sound and should stand. SDF, at ¶¶ 8, 32, 33, 39.

## III. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.

### A. Plaintiffs cannot prove the state's wolf trapping and snaring regulations are reasonably certain to result in incidental take of grizzly bears.

As the State articulated in its Response to Plaintiffs Motion for Preliminary

Injunction (Doc. 19, at 15-23), and in its filings before the Ninth Circuit (Doc. 7.1,

at 33-57; Doc. 20.1, at 12-29), Plaintiffs cannot demonstrate that the Commission's

wolf trapping and snaring regulations are "reasonably certain" to cause incidental

take of grizzly bears.

When seeking a permanent injunction, a plaintiff must show:

"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803,

817 (9th Cir. 2018) (citations omitted).

"When considering an injunction under the ESA, we presume that remedies

at law are inadequate, that the balance of interests weighs in favor of protecting

endangered species, and that the public interest would not be disserved by an

injunction." *Id.* Nevertheless, the ESA does not restrict the Court's discretion to "decide whether a plaintiff has suffered an irreparable injury." *Id.* (citing *Cottonwood*, 789 F.3d at 1090). Courts may not presume irreparable injury where there has been a procedural violation in ESA cases. Rather, courts must find a "**reasonably certain** threat of imminent harm to a protected species" to issue an injunction. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1999); *see also Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996) (emphasis added). "A 'possibility' of irreparable harm cannot support an injunction." *Nat'l Wildlife Fed'n*, 886 F.3d at 818.

Even if this Court were to accept all Plaintiffs' inadmissible "facts" as true (which is not proper at summary judgment), those "facts," as well as the points mentioned below, do not create a "reasonable certainty" that the State's trapping regulations will result in incidental take of grizzly bears.

### 1. Recognition that incidental take of grizzly bears may occur does not equate to "reasonable certainty."

The State concedes that the statements made in Doc. 55-23 recognize that incidental take of grizzly bears may occur. However, the State's acknowledgement that those occurrences may be possible does not equate to the fact that the State's **trapping** regulations are "reasonable certainty" to cause incidental take of grizzly bears. First, hound-hunting is not tied to trapping and, rather, is a form of hunting. Given this, any incidental take from hound-hunting is not associated with the

State's trapping regulations and should not be considered by this Court. *Compare* 2023 Furbearer, Wolf, and Trapping Regulations (Doc. 55-22) *with* 2023 Black Bear Regulations (https://fwp.mt.gov/binaries/content/assets/fwp/hunt/regulations/2023/2023-black-bear-final-for-web.pdf).

Second, while the State may acknowledge that incidental take via wolf snaring **may** occur, the State has **no record** of a grizzly bear incidentally captured in a snare, in Montana. Doc. 20, at 14-16; *see also* SDF, at ¶ 178. "May" does not equal reasonable certainty. Without an actual example or record of incidental take of a grizzly bear in a snare the Plaintiffs cannot prove that the State's snaring regulations are "reasonably certain" to result in incidental take of grizzly bears.

### 2. Incidental *take outside of Montana does not create "reasonable certainty" in Montana*.

Plaintiffs advocate that evidence outside of Montana (Idaho, Wyoming, British Columbia, and Alberta) should be considered by this Court. Doc 56, at 13. For purposes of brevity, the State reiterates and incorporates the arguments it made in its Ninth Circuit Opening Brief (pg. 37 - 41) and in its Ninth Circuit Reply Brief (pg. 19-20). As noted in the Ninth Circuit briefing, the relief requested here relates only to **Montana's** trapping and snaring regulations, and the likelihood of incidental capture in **Montana** due to Montana's regulatory structure. Evidence of

"take" outside of Montana is irrelevant and cannot be considered by this Court to posit "reasonable certainty."

### 3. While baits or lures may attract grizzly bears, the use of baits or lures does not lead to incidental take, nor establish "reasonable certainty."

The State concedes a **possibility** that baits and lures used by recreational trappers **may** attract grizzly bears. However, attracting a grizzly bear to a trap and that same grizzly bear becoming trapped are two different situations. Plaintiffs own witness, Mr. Niemeyer stated, "[a]ny bear can be attracted to" a trap, "I've had bear approach, smell, just take a whiff and keep going." Doc. 55-5, 88:13-19; *see also* SDF, at ¶¶ 42, 47, 49, 135. That same witness also stated that grizzly bears are attracted to the "tutti frutti stuff," "berry scent," "fruit smell," and "doughnuts," which differ from what recreational wolf trappers use. *Id.* at 87:20-88:7. Further, Mr. Niemeyer trapped for wolves in core areas of grizzly habitat and trapped wolves one mile outside of the area he found grizzly tracks, and never had an incidental capture of a grizzly bear. *Id.* at 89:3-12; *see also* SDF, at ¶¶ 47, 49.

### B. It is unclear how this court can provide the Plaintiffs the relief they seek with regard to coyote trapping.

The Plaintiffs listed three parties in this lawsuit. While all parties seem relevant to this case, it is evident that the Plaintiffs failed to include MDOL or the Montana Board of Livestock as a necessary party.

As noted above, in Section I, the MDOL retains authority over predators. In fact, § 81-7-102, MCA, states that "[t]he department shall conduct the destruction and control of predatory animals" and that, "[t]he department shall adopt rules applicable to predatory animal control…." § 81-7-102(1), (2), MCA.

Given the absence of MDOL, it remains unclear how this Court could provide Plaintiffs the relief they seek – a permanent injunction limiting trapping and snaring for coyotes where grizzly bears are present, between January 1 and February 15.

## <u>CONCLUSION</u>

This Court lacks subject matter jurisdiction, given the procedural deficiencies in Plaintiffs' notice of intent to sue and failure to include necessary parties. Even if this Court had subject matter jurisdiction to adjudicate Plaintiffs' motion, genuine disputes of material fact preclude summary judgment. Accordingly, this Court should deny Plaintiffs MSJ.

RESPECTFULLY SUBMITTED this 6th day of May, 2024.

By: */s/ Alexander Scolavino*
    **Alexander Scolavino**
    Agency Legal Counsel
    Montana Fish, Wildlife and Parks

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,492 words, excluding the caption, certificates of service and compliance, and if required, any tables of contents and authorities, and exhibit index.

By: */s/ Alexander Scolavino*
               **Alexander Scolavino**
               Agency Legal Counsel
               Montana Fish, Wildlife and Parks