IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FLATHEAD-LOLO-BITTERROOT CITIZEN TASK FORCE and WILDEARTH GUARDIANS, | CV 23–101–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| STATE OF MONTANA, LESLEY ROBINSON, and GREG GIANFORTE, | |
| Defendants, | |
| and | |
| MONTANA TRAPPERS ASSOCIATION, OUTDOOR HERITAGE COALITION, MONTANA STOCKGROWERS ASSOCIATION, MONTANA WOOL GROWERS ASSOCIATION, and MONTANA FARM BUREAU FEDERATION, | |
| Defendant-Intervenors. | |

In September 2023, Plaintiff conservation groups sued the State of Montana

("State"), Montana Fish and Wildlife Commission Chair Lesley Robinson, and

Governor Greg Gianforte (collectively, "State Defendants"), under § 9 of the

Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B), seeking to curb the

1

State's "continued authorization and recent expansion of wolf trapping and snaring in grizzly bear habitat" to avoid any unlawful "take" of grizzly bears. (*See* Docs. 1, 4.) The United States Court of Appeals for the Ninth Circuit upheld this Court's preliminary injunction, which limited Montana's 2023–2024 recreational wolf trapping and snaring season temporally, "to the time period when it is reasonably certain that almost all grizzly bears will be in dens."[1] (*See* Docs. 33, 58.) The Court declined to preliminarily enjoin coyote trapping and snaring because Plaintiffs had not adequately tied their requested relief to the challenged regulations. (Doc. 33.) After the appeal, the Montana Trappers Association and Outdoor Heritage Coalition ("Montana Trappers"), and the Montana Stockgrowers Association, Montana Wool Growers Association, and Montana Farm Bureau Federation ("Agricultural Groups") intervened to protect their abilities to trap and snare under Montana's current laws. (*See* Docs. 48, 71.)

Currently pending are Plaintiffs' motion for summary judgment, (Doc. 54), which State Defendants and Montana Trappers oppose, (Docs. 64, 82), and the Agricultural Groups' cross-motion for summary judgment on the issue of coyote trapping and snaring, (Doc. 76). Plaintiffs allege State Defendants are violating the ESA by allowing wolf and coyote trapping and snaring when and where grizzly

---

[1] The Ninth Circuit remanded the Preliminary Injunction Order to narrow the geographic scope of the injunction. (Docs. 58, 59.) That issue shall be addressed by separate order.

bears are out of their dens.  Plaintiffs seek to extend this Court's preliminary injunction until the State obtains an incidental take permit from the United States Fish and Wildlife Service, and to extend the wolf-trapping injunction to include coyote trapping.  Defendants generally argue that this Court lacks subject matter jurisdiction over Plaintiffs' claims due to procedural deficiencies in Plaintiffs' 60-day notice of intent to sue and failure to include necessary parties.  Jurisdictional concerns aside, Defendants insist that genuine disputes of material fact preclude summary judgment.  Defendants, collectively, dispute Plaintiffs' facts because, they argue, the bulk of Plaintiffs' evidence is inadmissible as their witnesses were not disclosed as experts, thus they are limited to lay witness testimony and cannot testify to the ultimate issue—whether future take of grizzly bears is reasonably certain to occur under the State's current trapping and snaring regulatory regime.

Relatedly, also before the Court are State Defendants' and Montana Trappers' motions to compel expert disclosures and to strike.  (*See* Docs. 87 and 92.)  Plaintiffs oppose.  (Doc. 92 at 2.)  The case management plan the parties agreed to in December 2023 did not contain an expert disclosure deadline and there was no trial date set in this case.  Early this year, the parties engaged in witness depositions.  However, Plaintiffs did not submit any expert disclosures until May 21, 2024, (*see* Doc. 86 at 4–6), after State Defendants refused to pay for the depositions of Plaintiffs' witnesses and argued on summary judgment that none of

Plaintiffs' offered testimony was admissible evidence because their witnesses were not designated experts under Federal Rule of Civil Procedure 26. In response to Plaintiffs' expert disclosures, on Friday, May 31, 2024, State Defendants filed a motion to compel additional expert disclosure, arguing Plaintiffs' disclosures were not satisfactory under Rule 26(a)(2)(B), and that all witness testimony in Plaintiffs' motion for summary judgment that is based on anything other than personal knowledge or experience should be stricken under Rule 37(c)(1). Plaintiffs counter that their recent disclosures are adequate, but alternatively, the Court should rule in their favor based solely on the record evidence and undisputed facts. A motions hearing was held on June 26, 2024, during which the parties argued the pending motions and were ordered to propose a timeline to complete expert disclosures and other pretrial matters in anticipation of a trial on the merits. The Court issued a Scheduling Order on June 27, 2024, setting the matter for a bench trial on December 2, 2024. (*See* Doc. 101.)

Because genuine issues of material fact persist, Plaintiffs' and Agricultural Groups' motions for summary judgment are denied. State Defendants' and Defendant-Intervenors' motions to strike are denied as moot and motions to compel expert disclosures are granted in part. The arguments regarding subject-matter jurisdiction are discussed first below, followed by the expert disclosure issues and the merits of the parties' respective motions for summary judgment.

4

ANALYSIS

## I.   Subject-Matter Jurisdiction

Federal courts have limited jurisdiction; as a result, the power of the federal court is limited to that which is authorized by Article III of the United States Constitution and statutes enacted by Congress. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)).

On summary judgment, Defendants argue this Court lacks subject-matter jurisdiction over the case because Plaintiffs' 60-day notice of intent to sue was procedurally deficient. Specifically, State Defendants allege Plaintiffs: (1) failed to notify the Secretary of the Department of Interior; (2) failed to articulate any alleged violation relating to coyotes; (3) failed to notify the Montana Department of Livestock; and (4) remitted the notice of intent to sue prior to the approval of the 2023–2024 Furbearer, Wolf, and Trapping Regulations. Defendants' jurisdictional arguments are discussed in turn.

### A.   Failure to Notify the Secretary of Interior

Defendants' first argue that Plaintiffs failed to notify the Secretary of Interior, as required by 16 U.S.C. § 1540(g)(2)(A)(i). Defendants are incorrect.

5

The ESA authorizes "any person" to bring a civil action "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). However, the ESA provides that "[n]o action may be commenced under subparagraph (1)(A) of this section . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." *Id.* § 1540(g)(2)(A)(i). "A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Sw. Ctr. for Bio. Diversity v. U.S. Bureau of Rec.*, 143 F.3d 515, 520 (9th Cir. 1998); *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 647 (9th Cir. 2015) ("This sixty-day notice requirement is jurisdictional.").

Although Plaintiffs only addressed their 60-day notice of intent to sue to United States Fish and Wildlife Service Director Martha Williams and Grizzly Bear Recovery Coordinator Hilary Cooley, Montana Governor Greg Gianforte, and Montana Fish, Wildlife and Parks Director Hank Worsech, (Doc. 64-1 at 1), attached to their reply, Plaintiffs provided documentation that shows they also notified the Secretary, via email, on May 10, 2024. (Doc. 85 at 3.) Thus, Plaintiffs notified the Secretary of their intent to bring this lawsuit against State Defendants.

6

*See Strahan v. Coxe*, 939 F. Supp. 963, 977 (D. Mass. 1996) ("All that is required is competent evidence that [Plaintiff] notified the Secretary [] of his intent to bring suit against the Defendants.").

### B.    Failure to Articulate any Alleged Violation Relating to Coyotes

Defendants next argue Plaintiffs failed to articulate any alleged violation relating to coyote trapping and snaring in their 60-day notice of intent to sue. Defendants are again incorrect.

"The purpose of the 60-day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue.  When given notice, the agencies have an opportunity to renew their actions and take corrective measures if warranted." *Sw. Ctr.*, 143 F.3d at 520 (internal quotation marks omitted).  "In many cases, an agency may be able to compel compliance through administrative action, thus eliminating the need for any access to the courts." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989).  "This policy would be frustrated if citizens could immediately bring suit without involving federal or state enforcement agencies." *Id.*

"[A] notice need not provide the exact details of the legal arguments that the plaintiffs intend to eventually make." *Conserv. Cong. v. Finley*, 774 F.3d 611, 618 (9th Cir. 2014).  "To provide proper notice of an alleged violation, a would-be plaintiff must '[a]t a minimum . . . provide sufficient information . . . so that the

7

[notified parties] could identify and attempt to abate the violation." *MacWhorter*, 797 F.3d at 651 (quoting *Sw. Ctr.*, 143 F.3d at 522). "A reviewing court may examine both the notice itself and the behavior of its recipients to determine whether they understood or reasonably should have understood the alleged violations." *Id.* "[T]he key issue [is] . . . whether the notice provided information that allowed the defendant to identify and address the alleged violations." *Id.*

In their 60-day notice, Plaintiffs generally alleged that "trap bycatch of grizzly bears resulting in wounds and potential death is an increasing source of prohibited take . . . and [the United States Fish and Wildlife Service] and the State of Montana must take actions to prevent or at least reduce it." (Doc. 64-1 at 3.) Plaintiffs specifically alleged that "[a]long with body-gripping traps, snares and foot and leg-hold traps for wolves, coyotes and other canids are a direct threat to grizzly bears." (*Id.* at 8.) As evidence of these allegations, Plaintiffs noted two instances of grizzly bear take that occurred as a result of coyote trapping in the Rogers Pass area. (*See id.* at 5).

Beyond a blanket assertion that these allegations are insufficient, Defendants cite no authority to support their demanding interpretation of the ESA's notice requirement. Moreover, State Defendants do not indicate that they took *any* action or evidence *any* intent to remedy Plaintiffs' concerns in response to the notice. *See MacWhorter*, 797 F.3d at 651. Thus, after examining "both the notice itself and

8

the behavior of its recipients to determine whether they understood or reasonably should have understood the alleged violations," Plaintiffs' notice was sufficient. *See id.* (noting "the analysis turns on the 'overall sufficiency' of the notice"). Plaintiffs' notice provided information from which Defendants could reasonably infer that Plaintiffs intended to challenge Montana's authorization of coyote trapping and snaring in grizzly bear habitat when bears are out of their dens.

### C.    Failure to Notify the Montana Department of Livestock

Defendants argue that because the Montana Department of Livestock "retains authority over predator control," *see* Mont. Code Ann. § 81-7-102, Plaintiffs' failure to notify the Department of Livestock as an "alleged violator" deprives this Court of subject matter jurisdiction over coyote trapping. Defendants' argument is without merit as it incorrectly implies that Fish and Wildlife has no authority over predator control, and thus cannot properly remedy or, at a minimum, mitigate Plaintiffs' concerns.

Plaintiffs challenge is specific to the State's refusal to curb private citizen trapping and snaring activities related to coyotes, which is an area that the Department of Fish and Wildlife can, and does, regulate.  *See* Mont. Code Ann. § 87-1-201(8) ("[T]he department is authorized to make, promulgate, and enforce reasonable rules and regulations not inconsistent with the provisions of Title 87, chapter 2, that in its judgment will accomplish the purpose of chapter 2 ["Fishing,

Hunting, and Trapping Licenses].”); *see also Wildlife Mgm't & Regulated Trapping in Mont. Info. Sheet*, Mont. Fish, Wildlife & Parks, *available at* https://www.montanatrappers.org/pdf/management/Regulated-Trapping-In-MT.pdf (accessed June 12, 2024) (stating that Montana’s “[t]rapping regulations cover 10 legally classified species, several *predators*, and some nongame animals with fur. . . . Certain general trapping regulations apply when trapping for these animals.” (Emphasis added.)). Title 87 of the Montana Code Annotated (“Fish & Wildlife”) twice defines “predatory animal” as “coyote, weasel, skunk, and civet cat,” *see* Mont. Code Ann. §§ 87-2-101(11) and 87-6-101(25), and prescribes “Trapping and Snaring Offenses,” which include offenses related to trapping and snaring for predatory animals, *id.* § 87-6-601(1). Additionally, Montana’s wolf and furbearer trapping and hunting regulations expressly reference the State’s limited rules related to coyote trapping, including requiring nonresidents to purchase a license in order to trap predators, and to comply with setback rules and other general trapping and snaring regulations. (*See* Doc. 55-22.)

Although Montana Code Annotated Title 81 (“Livestock”), Chapter 7 (“Predatory Animal Control”), Section 102 allows the State to kill coyotes and other predators by using any method “necessary and proper for the systematic destruction of the predatory animals,” that section refers only to predator control conducted or directed by the State, which is separate and apart from the private

party trapping activity at issue in this case. *See also* Mont. Code Ann. § 87-7-102(4) ("this section do not interfere with or impair the power and duties of the department of fish, wildlife, and parks in the control of predatory animals by the department of fish, wildlife, and parks as authorized by law . . . ."). Because Plaintiffs do not challenge the State's authorization of government-conducted or -directed predator control, activities for which the State is exempt under the ESA, failure to notice the Montana Department of Livestock does not preclude subject matter jurisdiction over Plaintiffs' coyote trapping claims.

D.   **Failure to Notice the 2023–2024 Trapping Regulations**

Finally, Defendants contend that Plaintiffs failed to provide sufficient notice under the ESA because they remitted their 60-day notice of intent to sue before the Commission approved the 2023–2024 trapping and snaring regulations. Citing *Friends of Animals v. Ashe*, Defendants assert a "pre-violation" notice of possible future violations is insufficient to satisfy the ESA's 60-day notice requirement. 51 F. Supp. 3d 77, 86 (D.C. Cir. 2014). *Friends of Animals* is inapposite.

In *Friends of Animals*, the plaintiffs challenged the United States Fish and Wildlife Service's failure to respond to a series of citizen petitions seeking to list 39 different animal species worldwide as either endangered or threatened. 51 F. Supp. 3d at 80–81. Under the ESA, the agency was required to make a 90-day finding, "to the maximum extent practicable, within 90 days of receiving a

11

petition" and "complete a status review and publish a finding, within 12 months of receiving a petition that has received a positive 90-day finding." *Id.* at 81. The plaintiffs noticed their intent to sue, explaining that "both 'the 90-day petition finding and 12-month listing determinations' were past due, and that, therefore, 'the Secretary is in violation of subsections 4(b)(3)(A) and 4(b)(3)(B).'" *Id.* (alteration omitted). Critically, the plaintiffs' eventual lawsuit challenged only the agency's failure to issue mandatory 12-month findings. *Id.* at 85. The United States District Court for the District of Columbia reasoned that because the agency had taken no action on any of the petitions, and the 12-month rule was only triggered by a positive 90-day finding, "it was simply impossible for [the Fish and Wildlife Service] to know when, if ever, it would violate the ESA's 12-month deadline," and the plaintiffs' notice was insufficient. *Id.* at 86.

Here, Plaintiffs' notice was not a "pre-violation" notice, which is "when a plaintiff gives notice of an impending violation of the ESA—but before that violation has actually occurred." *Id.* at 84. The alleged violations in this case were ongoing; Plaintiffs alleged the State's prior regulations were causing illegal take and, as their notice indicated, illegal take would continue until affirmative action by the federal or state governments "to prevent or at least reduce it," which never occurred. Conversely, the State's 2023–2024 wolf and furbearer regulations did nothing to limit and, if anything, authorized expanded trapping and snaring activity

12

in active grizzly bear habitat statewide. Rather than indicating a lack of notice, the Commission's approval of the 2023–2024 regulations in August shows that Defendants actively chose not to address the alleged violations or do anything proactive to avoid Plaintiffs' lawsuit. *See MacWhorter*, 797 F.3d at 651. Defendants cannot now claim they were unaware of Plaintiffs' concerns.

### E.    Conclusion

In sum, Plaintiffs' 60-day notice is sufficient to satisfy the ESA's requirements and the Court has jurisdiction to consider the claims.

## II.    Expert Disclosures

Federal Rule of Civil Procedure 26 provides that, unless otherwise stipulated or ordered by the court, expert disclosures must be accompanied by a written report, prepared and signed by the witness, "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).  Written expert reports must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id.* Under Rule 26(a)(2)(C), "Witnesses Who Do Not Provide a Written Report," a disclosure must include "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

"Courts have limited the exemption from Rule 26(a)(2)(B) to the expert's percipient opinions." *Tarter v. Throne L. Off., P.C.*, 2019 WL 609337, at *3 (D. Mont. Feb. 13, 2019); *see Goodman v. Staples The Office Superstore, LLC*, 664 F.3d 817, 826 (9th Cir. 2011). "The distinguishing characteristic between expert opinions that require a report and those that do not is whether the opinion is based on information the expert witness acquired through percipient observations or whether, as in the case of retained experts, the opinion is based on information provided by others . . . ." *United States v. Sierra Pac. Indus.*, 2011 WL 2119078, at *4 (E.D. Cal. May 26, 2011).

Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." But "preclusion of evidence is neither mandatory, nor the only sanction the court may consider." *Tarter*, 2019 WL 609337, at *5.

14

Rule 26 requires that expert disclosures be made "at the times and in the sequence that the court orders [or] at least 90 days before the date set for trial or for the case to be ready for trial." Fed. R. Civ. P. 26(a)(2)(D). In determining whether a violation of a discovery deadline is justified or harmless, courts may consider the following factors: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 F. App'x, 705, 713 (9th Cir. 2010) (upholding the district court's decision to allow an improperly-disclosed witness to testify at trial because the witness' anticipated testimony was not a surprise and appellants were "obviously able to take steps they thought necessary to contend with his testimony at trial"). "[T]he burden is on the party facing sanctions to prove harmlessness." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

As summarized above, the case management plan to which the parties agreed in December 2023 did not designate a deadline for expert disclosures. (*See* Docs. 42, 43.) Nor did the parties stipulate to an expert disclosure deadline, as permitted by Rule 26, when it became apparent to them that a case management plan may have been inadequate. In response to Plaintiffs' motion for summary judgment, State Defendants objected to the majority of Plaintiffs' testimony on the

grounds that because Plaintiffs failed to designate any experts as required Rule 26, their witnesses could only provide lay witness testimony that is "rationally based on the witness's perception." *See* Fed. R. Evid. 701.  State Defendants' brief in opposition to summary judgment overwhelmingly relies on their allegation that most of Plaintiffs' declarants' testimony is inadmissible hearsay, (citing Fed. R. Evid. 801), including third-party reports of bears being out of dens and bears being injured referenced by Plaintiffs' declarants because those reports have not been authenticated, (citing Fed. R. Evid. 901).

In response to State Defendants' summary judgment brief, Plaintiffs served expert disclosures on State Defendants on May 21, 2024.  (*See* Docs. 86 at 5; 88-1.)  As there was neither an expert disclosure deadline nor a trial date set, this disclosure is timely.  Fed. R. Civ. P. 26(a)(2)(D).  But on May 23, 2024, State Defendants sent an email to Plaintiffs' counsel, claiming that Plaintiffs' disclosures failed to comport with the requirements of Rule 26(a)(2)(B) and requesting additional documentation by May 27, 2024.  (Doc. 88-2.)  On May 26, 2024, Plaintiffs provided a supplemental expert disclosure for Dr. David Mattson only. (Doc. 88-3.)

On May 31, 2024, State Defendants filed the instant motion, (Doc. 87), asking the Court to (1) compel Plaintiffs to produce expert reports and disclosures that comply with Rule 26, (2) strike and disregard any opinion in Plaintiffs'

summary judgment filings that purports to be an expert opinion or is based on anything other than personal knowledge or experience, or (3) stay summary judgment until after Plaintiffs complete compliant expert disclosures and all Defendants have the opportunity to disclose rebuttal experts and file a sur-reply supported by their experts.  Plaintiffs did not serve either the original or supplemental disclosures on Montana Trappers.  (Doc. 94.)  On June 12, 2024, Montana Trappers filed a motion "in support" of the State's motion to compel and strike expert testimony.  (Doc. 92.)  At the June 26 hearing, Defendants acknowledged that should Plaintiffs' motion for summary judgment be denied, their motions to strike would be moot.  They argued, however, that the motions to compel should remain on the table.

Ultimately, although Defendants argue a per se rule that the failure to disclose is not harmless, and harmlessness is Plaintiffs' burden to prove, it is notable that neither Defendant has argued they were actually prejudiced by Plaintiffs' lack of disclosure in this case.  That is because Plaintiffs' failure to provide expert disclosures prior to summary judgment did not cause prejudice or surprise Defendants.  Considering the parties' robust scientific debate at the preliminary injunction stage, as well as the fact that Defendants conducted depositions of the "experts" in question in February and March, (see Doc. 88-3 at 100), Defendants were fully aware of Plaintiffs' factual contentions and intention

to rely on their declarants on summary judgment, and had ample opportunity to develop substantive challenges to Plaintiffs' declarants' testimony. *Lanard Toys*, 375 F. App'x, at 713.

On the one hand, the State's choice to wait until the eleventh hour to challenge Plaintiffs' experts based purely on procedural grounds is vexing.[2] On the other, Plaintiffs' disclosures do require scrutiny. Plaintiffs' initial expert disclosure lists eight witnesses: (1) Dr. Barrie Gilbert; (2) Dr. David Mattson; (3) Mr. Carter Niemeyer; (4) Dr. Brian Horejsi; (5) Dr. Frank L. Craighead; (6) Dr. Diane Boyd; (7) Dr. Katherine Kendall; and (8) Mr. Timothy Manley. (Doc. 88-1 at 1–5.) The provided text indicates that Gilbert, Craighead, Boyd, Kendall, and Manley have "offered [their] expertise gratis for [Plaintiffs] in this case." (*Id.*) Thus, it appears that Plaintiffs claim only Mattson, Niemeyer, and Horejsi were "retained to provide expert testimony" under Rule 26(a)(2)(B), and apparently only retained as such because the State refused to pay those deposed individuals for their time and travel expenses. (*See* Doc. 96 at 2.) However, whether or not the witness was paid to testify in the case is not determinative of whether a witness is required to provide a report under Rule 26. *See Cedant v. United States*, 75 F.4th 1314, 1322 (11th Cir. 2023) ("Rule 26(a)(2)(B) asks us to assess the initial reason

---

[2] Defendants do not argue that Plaintiffs' evidence fails to meet the standard for reliable scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

the expert was hired. We look to when an expert was 'retained' or 'specially employed' by a party and evaluate whether that retention was 'to provide expert testimony in the case' or for some other purpose.").

Contrary to Defendants' objections, it is likely not the case that all of Plaintiffs' declarants "lacked 'any personal knowledge about the events giving rise to the litigation, but were only given information later and asked to form opinions solely for the purposes of litigation.'" *See Tarter*, 2019 WL 609337, at *3 (quoting *Trulove v. D'Amico*, 2018 WL 1090248, at *3 (N.D. Cal. Feb. 27, 2018)). And "as long as the expert was not retained or specially employed in connection with the litigation, and his opinion about causation was premised on personal knowledge and observations made [], no report is required under the terms of Rule 26(a)(2)(B)." *Id.* at *4 (citing *Downey v. Bob's Disc. Furniture*, 633 F.3d 1 (1st Cir. 2011)). However, the extent to which each of Plaintiffs' experts' opinions were premised on materials they reviewed beyond their percipient knowledge is unclear on this record. And to make any sense of Defendants' sweeping objections to Plaintiffs' Statements of Undisputed Fact without more detailed disclosures requires wading through lengthy declarations and deposition testimony to parse out the admissible facts.

Even as non-retained, hybrid fact experts, Plaintiffs' disclosures do not fully satisfy the lesser requirements of Rule 26(a)(2)(C). Plaintiffs' repeated use of the

19

statement, "[the witness] is expected to testify to facts and opinions consistent with [their] signed declaration[s] and/or deposition in this matter" is insufficient. (*See* Doc. 88-1.) Further, Plaintiffs' supplemental disclosure included only an expert report from Dr. Mattson, his curriculum vitae, and deposition testimony dated March 7, 2024. (Doc. 88-3.) While Mattson's disclosure is sufficient, Plaintiffs must provide adequate expert reports for their other retained and hybrid fact experts under Rule 26. Accordingly, as set forth in the June 27, 2024 Scheduling Order, the parties must submit simultaneous expert disclosures by September 6, 2024, and rebuttal experts by September 27, 2024.[3] (Doc. 101.)

### III.   Summary Judgment

The fundamental issue in this case is whether the State's wolf and coyote trapping and snaring laws and regulations, or lack thereof, are reasonably certain to cause the future "take" of grizzly bears in violation of Section 9 of the ESA. Defendants insist there have been no past violations and can be no future violations because the State's mitigation measures—like its floating season start date and requirements like trap weight limits and breakaway devices and mandatory new trapper education courses—eliminate the likelihood of any future accidental capture of grizzly bears. Although Defendants' staunch insistence that there is no

---

[3] Fees will not be awarded under Rule 37(a)(5) because, under the circumstances, an award of expenses is unjust. *See* Fed. R. Civ. P. 37(a)(5)(A)(iii).

evidence of past take and will be no future harm to grizzly bears from the State's widespread authorization of trapping and snaring activity in Montana is not convincing, neither Plaintiffs nor Agricultural Groups have established that they are entitled to summary judgment on the ultimate question. Because genuine issues of material fact remain, this case is best resolved at trial. Thus, summary judgment is denied.

### A.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they have the potential to affect the outcome of the case and there is sufficient evidence for a jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings," but must present specific facts, supported by admissible evidence, showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49; Fed. R. Civ. P. 56(e). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

21

(9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

On cross-motions for summary judgment, it is a court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether that evidence demonstrates a genuine issue of material fact." *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001). Each motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (internal quotation marks omitted).

### B.    Factual Background

A detailed factual background of the State's regulations regarding wolf and coyote trapping and snaring was set forth in the Preliminary Injunction Order. (*See* Doc. 33.) Because the parties dispute most of the material facts related to the evidence regarding when and where grizzly bears are likely to be out of their dens and the impact the State's regulations have on grizzly bears, (*see* Doc. 68), those facts must be established at trial.

### C.    The ESA

"The ESA obligates federal agencies 'to afford first priority to the declared national policy of saving endangered species.'" *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084–85 (9th Cir. 2005)

(quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)).  In 1975, the U.S. Fish and Wildlife Service classified the grizzly bear as a "threatened" species under the ESA.  *See* 40 Fed. Reg. 31,734–36 (1975).  A threatened species is defined as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

It is unlawful for anyone to "take" a protected species.[4]  16 U.S.C. § 1538(a)(1)(B).  A term of art under the statute, "take" is broadly defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  "A take may involve a past or current injury, or the prospect of an imminent threat of harm to a protected species."  *Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 605 (9th Cir. 2014).  "[I]njury can mean pain or stress, which trapping undoubtedly causes even when [listed individuals] are released with no physical indication of

---

[4] Although the ESA's implementing regulations generally prohibit the taking of any species that has been classified as endangered or threatened, 50 C.F.R. §§ 17.21, 17.31, there are exceptions to this general rule.  For example, a grizzly bear may be taken in self-defense or in defense of others, for scientific or research purposes, or if it creates a "demonstrable but non immediate" threat to human safety or is committing "significant depredations" of livestock, provided that reasonable efforts to capture and remove the bears have failed and that the taking is done by an authorized, tribal, state, or federal official.  *See* 50 C.F.R. § 17.40(b)(1)(i)(B)–(D).  Plaintiffs do not challenge these exceptions.

harm." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047,

1065–66 (D. Mont. 2018) (referring to lynx).  "[S]erious injury may not always be

immediately visible or ascertainable and even minor injuries can impair post-

release survival." *Id.* (citation omitted).  Trapping or capturing an endangered

species is a "take" even if the action does not cause injury or mortality.  *Animal*

*Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 98 (D. Me. 2008) ("[E]ven if a lynx is

harmlessly trapped, it has been subject to a prohibited take under the statute.").

Section 10 Incidental Take Permits exempt an actor from liability under the

ESA for authorized take that is "incidental to, and not the purpose of, the carrying

out of an otherwise lawful activity." *Strahan v. Sec'y, Mass. Exec. Off. of Energy*

*& Env't Affs.*, 458 F. Supp. 3d 76, 80 (D. Mass. 2020) (quoting 16 U.S.C.

§ 1539(a)(1)(B)).  "Such takings cannot occur, however, until the applicant

submits, and receives approval of, a conservation plan as outlined in § 1539(a)(2)."

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1510 n.2 (9th Cir. 1994).

The conservation plan must specify: (i) the likely impact of the taking; (ii) steps

the applicant will take to minimize and mitigate any impacts, and the funding that

will be available to implement those steps; (iii) any alternative actions the

applicant considered and the reasons why alternatives are not being utilized; and

(iv) other measures that may be necessary or appropriate for purposes of the plan.

16 U.S.C. § 1539(a)(2)(A).  The agency must issue an incidental take permit if,

after opportunity for public comment, it finds that the taking will be incidental, appropriately mitigated and funded, and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B). In the case of the grizzly bear, the Director of the U.S. Fish and Wildlife Service "may issue a permit for any activity otherwise prohibited with regard to threatened wildlife." *See Center for Biological Diversity v. Little*, 2024 WL 1178565, *14 (D. Idaho Mar. 19, 2024) (quoting 50 C.F.R. § 17.32, 17.32(b)(1)). Additionally, a district court may order a state defendant to apply for an Incidental Take Permit. *Id.* (citing *Strahan*, 458 F. Supp. 3d at 95); *see also Animal Prot. Inst., Ctr. for Biological Diversity v. Holsten*, 541 F. Supp. 2d 1073, 1081 (D. Minn. 2008).

To further ensure protected species' survival, the ESA's citizen suit provision, § 1540(g), authorizes private plaintiffs "to enjoin an imminent threat of injury to protected wildlife." *Forest Conserv. Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995). "Section 1540(g) does not contain any requirement that claims of a future injury to wildlife be based on past injury." *Id.* Similarly, a threat of extinction to the species is not required before an injunction may issue under the ESA; what is required is "a definitive threat of future harm to protected species, not mere speculation." *Nat'l Wildlife Fed'n*, 23 F.3d at 1512 n.8. Thus, "[a] reasonably certain threat of imminent harm to a protected species is sufficient

for issuance of an injunction under section 9 of the ESA." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996). Specifically, state-authorized recreational trapping and snaring violates the ESA when "a risk of taking exists [even] if trappers comply with all applicable laws and regulations in place." *Animal Prot. Inst.*, 541 F. Supp. 2d at 1079 (citing *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997) *cert. denied*, 525 U.S. 830 (1998)); *see also Strahan*, 458 F. Supp. 3d at 89–90 ("[A] regulatory scheme causes a prohibited taking under the [ESA] where the state licenses the use of gear in specifically the manner that is likely to result in a violation of federal law." (Internal quotation marks omitted.)).

### D.    Plaintiffs' Motion

Plaintiffs challenge the State's authorization of recreational trapping and snaring for wolves and coyotes, alleging that future take of grizzly bears in legal wolf and coyote traps is reasonably certain to occur under the State's regulatory scheme. Plaintiffs seek a permanent injunction declaring the State's regulations violate the ESA and enjoining the State from authorizing recreational wolf and coyote trapping and snaring in grizzly bear habitat, except from January 1 through February 15 of each year, unless and until the State receives an incidental take permit from the U.S. Fish and Wildlife Service authorizing any incidental take of grizzly bears. Defendants insist that genuine disputes of material fact preclude

summary judgment.[5]  Particularly given the issue of expert disclosures and the implications of disputed and/or undisclosed expert testimony in the factual record, Plaintiffs have not established they are entitled to summary judgment.

As a preliminary matter, Defendants do not dispute that grizzly bears can be and have been incidentally trapped; rather, the State generally argues that because there is no "verified" proof that a grizzly bear has been captured by a legally-set recreational wolf trap under the State's current regulations and subject to the locations and timeframe of Plaintiffs' requested injunction, none of that past data can be considered.  Plaintiffs argue these distinctions are immaterial and the evidence is relevant to show that "baited and scented traps will attract, capture, hold, injure, and kill grizzly bears at any time of the year that bears are out of their dens."  (Doc. 86 at 9.)  Plaintiffs are correct.

As discussed in the November 21, 2023 Preliminary Injunction Order, the relevant question is not whether each piece of evidence independently establishes an illegal taking but whether the risk of future take is reasonably certain to occur based on the evidence of prior harm to grizzly bears coupled with the State's authorization of expanded trapping and snaring activity in grizzly bear habitat

---

[5] State Defendants repeatedly refer to briefing that was before the Ninth Circuit Court of Appeals and state that arguments made to the Ninth Circuit are "incorporated by reference."  (*See* Doc. 64 at 14 n.2, 30, 32.)  Ninth Circuit briefing is not a part of this record and is not considered.  Fed. R. Civ. P. 56(c)(3).

when bears are out of their dens.[6]  Undisputed evidence of past take is not required

to establish reasonable certainty of future take.  *See Rosboro Lumber*, 50 F.3d at

785.  "The Court needs not wait until [a Montana] recreational wolf trapper

complying with all of [Montana's] laws and rules actually reports a trapped,

snared, or dead grizzly bear, as this would raise the standard to one of absolute

certainty and thereby frustrate the purposes of the ESA." *Little*, 2024 WL 1178565

at *15 (finding the plaintiffs in that case had demonstrated a reasonably certain

threat of imminent harm in connection with Idaho's decision to expand recreational

wolf trapping and snaring in areas where grizzly bears are present and during times

when grizzly bears are out of their dens).

However, genuine factual disputes remain that preclude summary judgment.

To be certain, the record contains accounts of grizzly bears being trapped and

harmed by wolf and coyote traps and snares in Montana and throughout the region.

But the parties fundamentally disagree about the extent to which these occurrences

support Plaintiffs' claim that more takings are reasonably certain to occur in light

---

[6] At least one court has determined that such an inquiry is best left to the expert
agency to determine under the incidental take permitting process, in this case the
U.S. Fish and Wildlife Service. *See Strahan*, 458 F. Supp. 3d at 94 (ordering the
defendants to "promptly seek an Incidental Take Permit" after finding that the ESA
"does not give this court the authority or discretion to decide which Section 9
violations are excusable and which are not. . . ." and "allowing the Incidental Take
permitting process to take place ensures that Congress's objectives for the [ESA]
are achieved").

of expanded trapping and increased wintertime grizzly bear activity, as well as the

effectiveness or ineffectiveness of the State's floating season start date and other

mitigation measures.  Giving Defendants the benefit of all reasonable inferences,

*Lenz*, 815 F.3d at 1150, and in light of the expert-related evidentiary dispute

discussed above, Plaintiffs' motion for summary judgment is denied.

## E.    Agricultural Groups' Cross Motion

Agricultural Groups cross-move for partial summary judgment on the issue

of coyote trapping and snaring only.  (Doc. 76.)  They argue the evidence shows

"scant incidents of bear being affected by coyote snares or traps, and no record of

significant injury or mortality"; rather, "properly-deployed coyote traps and snares

do not threaten to take grizzly bears."  (Doc. 81 at 2.)  Plaintiffs counter that

Montana's regulations permit anyone to trap and snare for coyotes year-round in

occupied grizzly bear habitat, and although coyote traps are typically smaller than

wolf traps, State officials have recorded instances of grizzly bears captured by

public trappers targeting coyotes.

Contrary to Agricultural Groups' assertions, there is convincing evidence in

the record that coyote traps can at least injure grizzly bears.  Defendants

superficially dispute this fact based on technicalities; for example, insisting that

any evidence of past take must be "verified" and caused by a legally-set trap,

which misses the point.  (*See* Docs. 68 at ¶¶ 163–65 (partially disputing record

evidence); 77 at 4 (adopting State Defendants' responses).)  Therefore, because a

rational trier of fact could find that Plaintiffs are correct on the issue of coyote

trapping and snaring, summary judgment to Agricultural Groups is denied.

CONCLUSION

Because genuine disputes of material facts remain, IT IS ORDERED THAT

Plaintiffs' (Doc. 54) and Agricultural Groups' (Doc. 76) motions for summary

judgment are DENIED.  Defendants' and Defendant-Intervenors' motions to strike

are DENIED as MOOT and motions to compel are GRANTED IN PART as

discussed above.  (Doc. 87, 92.)  A bench trial in this matter has been set for

December 2, 2024.  (*See* Doc. 101.)

DATED this **28** day of August, 2024.

10:01 A.U.

Donald W. Molloy, District Judge
United States District Court